Chris **BRIDGEFORD**, Plaintiff,

v.

Shirley S. **CHATER**, Commissioner of Social Security,[1] Defendant.

No. 95–4059–SAC.

United States District Court, D. Kansas.

Nov. 15, 1995.

---

**1.** Effective March 31, 1995, the functions of the Secretary of Health and Human Services in social security cases were transferred to the Commissioner of Social Security. P.L. No. 103–296. The court hereby substitutes the Commissioner for the Secretary in the caption of this case. In the body of the order, however, the court will still refer to the Secretary who was the acting party in the underlying proceedings.

Steven M. Tilton, Tilton & Hoffman, Topeka, KS, for plaintiff.

D. Brad Bailey, Office of United States Attorney, Topeka, KS, for defendant.

### MEMORANDUM AND ORDER

CROW, District Judge.

This is an action to review the final decision of the Secretary of Health Human Services [42 U.S.C. § 405(g)] denying the plaintiff Chris Bridgeford's application for disability insurance benefits under Title II of the Social Security Act. The case is ripe for decision on the plaintiff's motion for order reversing the Secretary's decision (Dk. 7) and on the Secretary's brief in opposition (Dk. 9).[2]

### PROCEDURAL HISTORY

Chris Bridgeford applied for disability benefits. The application was denied initially and on reconsideration. Following the hearing held August 24, 1994, the ALJ issued his decision on September 21, 1994. The ALJ found that Bridgeford was entitled to a closed period of disability beginning July 16, 1991, and ending December 15, 1992, and that Bridgeford was not disabled after December 15, 1992. On February 21, 1995, the Appeals Council denied Bridgeford's request for review. On March 28, 1995, the Appeals Council vacated its prior order, considered the additional evidence submitted by Bridgeford, and again denied his request for review. Thus, the ALJ's decision stands as the Secretary's final decision.

### STANDARD OF REVIEW

■ The court's standard of review is set forth at 42 U.S.C. § 405(g), which provides that "the finding of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive." Substantial evidence is more than a scintilla and is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401–02, 91 S.Ct. 1420, 1427–28, 28 L.Ed.2d 842 (1971); *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989). "A finding of ' "no substantial evidence" will be found only where there is a "conspicuous absence of credible choices" or "no contrary medical evidence." ' " *Trimiar v. Sullivan*, 966 F.2d 1326, 1328 (10th Cir.1992) (quoting

**2.** The plaintiff appears to have followed former D.Kan.Rule 503 which provides for the filing of "an appropriate dispositive motion and memorandum" for a social security appeal. The Tenth Circuit in *Olenhouse v. Commodity Credit Corp.*, 42 F.3d 1560, 1579 n. 29 (10th Cir.1994), disapproved this rule and, specifically, the motion practice under it. Since the filing of the plaintiff's motion, the United States District Court for the District of Kansas has amended its local rules effective October 1, 1995. Under the new local rule governing Social Security appeals, D.Kan. Rule 83.7, the parties are required to file only briefs in compliance with D.Kan.Rule 7.6. For purposes of the present appeal, the court attaches no legal significance to the dispositive motion that accompanies the plaintiff's memorandum. The court intends to follow the well-established standard of review for social security appeals and to rely only on what evidence is found within the administrative record.

*Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir.1983) (quoting *Hemphill v. Weinberger,* 483 F.2d 1137 (5th Cir.1973)). "Evidence is insubstantial if it is overwhelmingly contradicted by other evidence." *O'Dell v. Shalala,* 44 F.3d 855, 858 (10th Cir.1994) (citation omitted).

The court's review also extends to determining whether the Secretary applied the correct legal standards. *Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir.1994). Besides the lack of substantial evidence, reversal may be appropriate when the Secretary uses the wrong legal standards or the Secretary fails to demonstrate reliance on the correct legal standards. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994).

The court's duty to assess whether substantial evidence exists:

"is not merely a quantitative exercise. Evidence is not substantial 'if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.'"

*Gossett v. Bowen,* 862 F.2d 802, 805 (10th Cir.1988) (quoting *Fulton v. Heckler,* 760 F.2d 1052, 1055 (10th Cir.1985)). The court is not to reweigh the evidence or substitute its judgment for the Secretary's. *Glass v. Shalala,* 43 F.3d at 1395. The court typically defers to the ALJ on issues of witness credibility. *Hamilton v. Secretary of Health & Human Services,* 961 F.2d 1495, 1498 (10th Cir.1992). The courts, however, do not mechanically accept the Secretary's findings. *Claassen v. Heckler,* 600 F.Supp. 1507, 1509 (D.Kan.1985); *see Ehrhart v. Secretary of Health & Human Services,* 969 F.2d 534, 538 (7th Cir.1992) ("By the same token, we must do more than merely rubber stamp the decisions of the Secretary." (citation omitted)). Nor will the findings be affirmed by isolating facts and labelling them substantial evidence, as the court must scrutinize the entire record in determining whether the Secretary's conclusions are rational. *Holloway v. Heckler,* 607 F.Supp. 71, 72 (D.Kan.1985). "We examine the record as a whole, including whatever in the record fairly detracts from the weight of the Secretary's decision and, on

that basis determine if the substantiality of the evidence test has been met.'" *Glenn v. Shalala,* 21 F.3d 983, 984 (10th Cir.1994) (quoting *Casias v. Secretary of Health & Human Services,* 933 F.2d 799, 800–01 (10th Cir.1991)); *see Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951).

The qualifications for disability insurance benefits under the Social Security Act are that the claimant meets the insured status requirements, is less than 65 years of age, and is under a "disability." *Flint v. Sullivan,* 951 F.2d 264, 267 (10th Cir.1991). An individual "shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 423(d)(2)(A). The claimant has the burden of proving a disability that prevents him from engaging in his prior work for a continuous period of twelve months. *Trimiar,* 966 F.2d at 1329. The burden then shifts to the Secretary to show that the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Sorenson v. Bowen,* 888 F.2d 706, 710 (10th Cir. 1989). The Secretary satisfies this burden if substantial evidence supports it. *Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993).

For evaluating a claim of disability, the Secretary has developed a five-step sequential process. *Bowen v. Yuckert,* 482 U.S. 137, 140, 107 S.Ct. 2287, 2290, 96 L.Ed.2d 119 (1987). This process comes to an end if at any point the Secretary determines the claimant is disabled or not. *Gossett,* 862 F.2d at 805. Step one is whether the claimant is currently engaged in substantial gainful activity. If not, the fact finder next considers whether "the claimant has a medically severe impairment or combination of impairments." *Yuckert,* 482 U.S. at 141, 107 S.Ct. at 2291. Step three entails determining whether the impairment is equivalent to one of a number of impairments found in the

"Listing of Impairments," 20 C.F.R. Part 404, Subpt. P, App. 1, which the Secretary acknowledges are so severe as to preclude substantial gainful activity. If no equivalency, the claimant must show that because of the impairment he is unable to perform his past work. The final step is to determine whether the claimant has the residual functional capacity (RFC) to perform other work available in the national economy, considering such additional factors as age, education, and past work experience. *See Williams v. Bowen,* 844 F.2d 748, 750–52 (10th Cir.1988).

**ALJ'S DECISION**

In his order of December 10, 1993, the ALJ made the following findings:

1. The claimant met the earnings requirements of the Act on July 16, 1991, the date she stated she became unable to work, and continues to meet them through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since July 16, 1991.

3. The medical evidence establishes that the claimant has the following impairments: status post diskectomy, disc bulging at L4–5 and narrowing at L3–4, possible small recurrent herniated disc at L5–S1, and degenerative disc disease of her lumbar spine. The claimant also suffers major depression which has resulted in no significant limitation of function as reflected in the attached Psychiatric Review Technique Form. Nevertheless, she does not have an impairment or combination of impairments listed in, or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

4. The claimant's testimony regarding her subjective complaints is found not credible for the reasons set forth in the Evidence, Evaluation, and Rationale section of this decision.

5. From July 16, 1991 through December 15, 1992, claimant's residual functional capacity precluded sustaining substantial gainful activity at any exertional level due to treatment and pain following her back injury and recovery from subsequent surgery.

6. On and after December 16, 1992, claimant experienced medical improvement to the point that she could perform sedentary work with the following additional limitations: unable to bend, stoop, or squat; unable to lift more than 10 pounds; and must have the option to sit or stand at will.

7. The claimant has been unable to perform her past relevant work at any time pertinent to this decision.

8. The claimant is 38 years old, which is defined as a younger individual (20 CFR 404.1563), and she has a high school education (20 CFR 404.1564).

9. The claimant is unable to transfer any acquired work skills to the skilled or semi-skilled work functions of other work (20 CFR 404.1568).

10. Section 404.1569 of Regulations No. 4 and Rule 201.00(h), Appendix 2, Subpart P, Regulations No. 4, justifies the conclusion that considering claimant's residual functional capacity, age, education, and work experience, she was disabled from July 16, 1991 through December 15, 1992.

11. Claimant was under a disability as defined in the Social Security Act, commencing July 16, 1991 and ending December 15, 1992.

12. As of December 16, 1992, there were a significant number of unskilled sedentary jobs in the local and national economies which claimant could perform. Examples of representative occupations are: cashier/ticket seller, information clerk, and security monitor.

13. On and after December 16, 1992, based on a residual functional capacity for sedentary work and claimant's age, education, and work experience, Section 404.1569 of Regulations No. 4, and the framework of Vocational Rule 201.28, Table No. 1, Appendix 2, Subpart P, Regulations No. 4, justify a finding of not disabled.

14. The claimant has not been under a "disability," as defined in the Social Security Act, as amended, since December 15, 1992 (20 CFR 404.1520(f)).

## SUMMARY OF ARGUMENTS

The claimant argues that the ALJ did not use the proper procedure and standard for evaluating her complaints of pain and that the ALJ had no basis in the record for rejecting her testimony as not credible. The claimant further contends the ALJ did not ascribe appropriate weight to the treating physicians' opinions and findings. The claimant also asserts that she is not able to do the sedentary work identified by the vocational expert and that the ALJ erred in relying on the same.

## FACTS

At the time of the hearing, Bridgeford was thirty-eight years of age. Her alleged disabling condition was the result of work-related injuries. She had been working for Douglas County Public Works driving a dump truck, flagging traffic, and shoveling asphalt. On July 16, 1991, while getting out of a truck, Bridgeford fell approximately three feet landing on her right side and back.

For her injury, Bridgeford saw several different doctors and underwent various courses of treatment, including surgery. She was first treated by her family physician, Phillip Godwin, M.D., in Lawrence, Kansas. Under his care, she was prescribed medications for the pain and inflammation and received several weeks of physical therapy. He released her for light duty work, but the employer would not let her return unless she was released for full duty work. In August of 1991, Dr. Godwin referred her to Dr. Wendt.

Dr. Wendt noted that the x-rays of her hip and back were "unremarkable, other than some degenerative changes in the lumbar area." (Tr. 162). Because the prescriptions for inflammation had not provided her much relief, he ordered a cortisone injection and kept her off work for two more weeks. Bridgeford's complaints of persisting pain continued. Dr. Wendt suggested the next course of treatment should be a program of work hardening. Bridgeford participated in the program for over a week and experienced some improvement but also continued to complain of pain. Her employer acting through Pam Madl, the Director of Personnel and Risk Management for Douglas County, asked her to seek a second medical opinion and to end her involvement in the work hardening program. Bridgeford next saw Dr. Mary Hoffman, another orthopedic surgeon in Lawrence.

Dr. Hoffman treated Bridgeford from October 9, 1991, through February 7, 1992. A CT scan "showed degenerative changes at L4–5 and L5–S1 including both narrowing and bulging of the disc at both levels. There was no evidence of disc herniation or spinal stenosis." (Tr. 165). Besides prescribing stronger narcotics, Dr. Hoffman ordered an epidural block and recommended physical therapy; neither of which offered much relief for the pain. (Tr. 160). Dr. Hoffman last saw her on February 7, 1992, at which time her chronic low back and leg pain had not changed. Dr. Hoffman refilled the prescription for Lortab on February 12, 1992, but Bridgeford did not make her appointment scheduled for March 7, 1992. (Tr. 166).

Bridgeford returned to the office where Dr. Wendt worked and was seen by Dr. Kenneth Wertzberger on March 17, 1992. Following the visit, Dr. Wertzberger wrote Pam Madl, the Director of Personnel and Risk Management for Douglas County, a letter which included the following:

It is difficult for me to explain the seriousness of her difficulty. I am sure she has degenerative disc disease as seen on x-ray, as so many of us over 40 do; however, I cannot justify her being totally incapacitated by this. Therefore, with permission, I think we need to proceed to work-hardening. Pain clinics would probably not be of benefit.

Also, a very effective way of dealing with this (or at least helping) may be to bring the patient into work when she is not at work-hardening, as so many other employers do. There could be some trivial job for her to do. Being at home is no return-to-work incentive.

(Tr. 160). The next month Bridgeford again complained to Dr. Wertzberger of "totally limiting pain." He also wrote Madl about this visit:

> This patient's pain, of course, is out of proportion to what one would normally see with some degenerative disease. Because of this, I think we are forced into going ahead with a myelogram and contrast CT to clear the area. Should these tests be normal, we can proceed to a pain clinic.

(Tr. 160). The results of the myelogram were normal, and the CT scan with contrast "showed the possibility of a herniated disc at L5–S1, on the right. It is small." (Tr. 101).

Dr. Wertzberger referred Bridgeford to Dr. Mark Bernhardt to discuss back surgery. The surgery was recommended but with the limited goal of lessening the right leg sciatic pain and with some doubts that surgery would reduce the back pain which could be due to the degenerative changes in her spine. (Dk. 144). On June 18, 1992, Dr. Bernhardt operated on Bridgeford performing a right L5–S1 hemi-laminotomy and discectomy with right sacral foraminotomy. (Dk. 143). At surgery, Dr. Bernhardt found a "more profound and discreet pathology" in that there was a disc protrusion and a sequestrated disc herniation. (Dk. 143). Because Bridgeford had complained of greater leg pain than back pain and because of the surgical findings and procedures performed, Dr. Bernhardt "felt there was a much better prognosis for relief of pain with surgical treatment." (Dk. 143). Though she still complained of sciatic pain on discharge, Dr. Bernhardt was cautiously optimistic that this would improve.

On his post-operative observations, Dr. Bernhardt noted that it was "disconcerting" that she appeared no better than before surgery. (Tr. 142). From the visit in August of 1992, Dr. Bernhardt recorded that the back pain had not improved but that he believed it would improve with more time. He also wrote that the numbness and paresthesia in the right leg had resolved following surgery. His impression was "Herniated disc disease L5–S1 with resolution of paresthesia and numbness with residual mechanical back pain." (Tr. 142). He also saw no evidence of post-operative instability.

In September of 1992, Dr. Bernhardt noted continuing right leg radicular pain and back pain:

> The fact that she does not seem better does not completely surprise me. However, I think that with excision of the disc, the pressure off the right S1 nerve root has been relieved and this route has a good chance to recover and her pain improve over time.

(Tr. 141). He ordered a rehabilitation program and evaluation for epidural steroid injections. In November of 1992, Bridgeford complained of not only pain in back and right leg but also in her left leg. From Bridgeford's visit in January of 1993, Dr. Bernhardt recorded:

> She states she is improved from her immediate preoperative status but on the whole has not improved. . . .

> The numbness in her right leg has improved. She rates her pain as 50% in the back and 50% in the right leg. She has not worked for a year and a half.

> X–RAYS: I obtained AP & laterals in flexion and extension of the lumbar spine. There is no evidence of postoperative instability.

> IMPRESSION: Herniated disc disease L5–S1 status post laminotomy, persistent mechanical back pain and persistent radiculopathy with resolution of some right leg numbness.

> RECOMMENDATIONS: I told Ms. Bridgeford that she needs to resolve her disability issues. I recommended that she get into a vocational rehabilitation program so that she can return to some form of sedentary work. I do not think she will be able to return to manual labor. She needs to continue with exercise, weight loss and try to stop smoking.

> . . . .

> I think she has reached maximum medical improvement and needs to be placed in a vocational rehabilitation program. I think her long term prognosis is for general

improvement albeit slow. I do not think any further surgery is indicated.

(Tr. 140).

On January 29, 1993, Dr. Wertzberger began seeing Bridgeford again. In his letter to Madl dated the same day, Dr. Wertzberger reported that Bridgeford's complaints of pain had not changed, that he did not "have a whole lot else to offer her, that he would send information to vocational rehabilitation, and that "now the problem is whether or not she will get back to being a functional worker." (Tr. 158). In June of 1993, she visited Dr. Wertzberger and told him that vocational rehabilitation services had turned her down because there was nothing she could do in light of her complaints of pain. In August, Dr. Wertzberger ordered a CAT scan and myelogram. He wrote Madl a letter dated August 24, 1993, which included the following sentence: "I would say that Christy's complaints certainly are out of proportion to what I would hope they could be but she does have the recurrent disc." (Tr. 236).

In September of 1993, Dr. Bernhardt evaluated the CAT scan and myelogram and then ordered an MRI. (Tr. 206). From the MRI, he found "a small recurrent disc herniation at L5–S1." (Tr. 207). He concluded that there was a fifty percent chance of improving her leg pain from surgical procedures of decompression and discectomy but that the back pain probably could not be improved by surgery because of the spondylitic changes at L3–4, L4–5, and L5–S1. (tr. 206–07).

In October of 1993, Bridgeford visited with Dr. Wertzberger about another surgery. He told her: "My opinion is that she could accept the way she is (although she says she cannot work or do anything) or she can go ahead and try to get better relief." (Tr. 234). Bridgeford apparently elected not to undergo additional surgery.

In January of 1994, he wrote the plaintiff's worker's compensation attorney in Lawrence, stating in part:

Therefore, I really see no reason to send her to have a determination of functional capacity because she says there is nothing that she can do without pain. The functional capacity would not generate any use-ful information unless she is at the point where she is ready to consider returning to some type of work. If something has changed about Christy's case that would make one believe there is some possibility of her returning to work, I could reconsider; however, there are multiple good places in Lawrence where she could have a functional capacity.

(Tr. 231).

In February of 1994, Bridgeford visited Dr. Wertzberger and personally requested a referral for a functional capacity evaluation. Dr. Wertzberger recorded the following about that visit:

Christy came in for a referral to the KRCC Work Recovery Center in Topeka. She is working with a lawyer in Topeka to obtain Social Security. She does not want to go here in Lawrence, as she wants to go someplace different for the evaluation.

My feelings have been that it would be good to get her back to some kind of sedentary type job. However, she feels she can do no job at all. That is why she wants to get Work Capacities—in order to have that evaluation.

As far as her back goes, it has been hurting more lately and she wants to get a back brace for it. I am sending her down to therapy for a Warm–N–Form back brace. We will see if that helps. I have given her the referral and she will return on a p.r.n. basis.

(Tr. 233).

The Work Recovery Center in Topeka conducted an ERGOS functional capacity evaluation of Bridgeford in March of 1994. The report stated the following conclusions:

1) Meets all exertional levels required for sedentary part time work as defined by U.S. Department of Labor tasks. 2) Her performance indicates this is the MINIMUM she is capable of doing (low performance in majority of activities including hand tasks). 3) Primary limiting factors are reports of discomfort and self-limiting behavior.

(Tr. 213). The report further noted that the level of Bridgeford's discomfort complaints increased during the testing activities and

that her use of Darvocet "could have negatively impacted the results of the evaluation." (Tr. 213).

In July of 1994, Dr. Elias Chediak performed a consultative psychological exam. (Tr. 219). While diagnosing major depression, Dr. Chediak found nothing that negatively impacted psychological capacity for work.

Bridgeford testified at the hearing that she had not worked since her injury on July 16, 1991. The present source of income for Bridgeford and her husband was her workers' compensation benefits, as her husband was disabled and unemployed.

She testified that migraine headaches and constant pain in her lower back and both hips and legs prevented her from doing any type of work. She said her pain was aggravated by sitting more than fifteen minutes, standing more than ten minutes or walking one block. On a scale of one (lowest pain) to ten (highest pain), Bridgeford said her pain averaged seven and on bad days it averaged nine. The Darvocet she takes does not provide any real relief from the pain. When asked if she could do sedentary work, Bridgeford answered:

No, because I need to lie down a lot during the day and my headaches make it hard for me to concentrate on anything that I do and I need to lay down just to get some relief. That's the only way I get relief, somewhat, is to lay down, which I do a lot during the day.

(Tr. 253). Bridgeford estimated that during an eight-hour work day she would need to lie down four or five times for an hour each time. She described her headaches as occurring twice a week on the average and lasting twenty-four hours. Concentration, like that required to do crossword puzzles, causes her headaches.

Bridgeford testified about being fatigued. The pain keeps her from falling to sleep and then causes her to wake after only a few hours. She estimates sleeping only four or four and one-half hours a night.

Bridgeford told the ALJ she was still experiencing panic attacks once a week. She compared them to heart attacks with the symptoms being an accelerated pulse, "heavy feeling," "sweat," and "panic-stricken." (Tr. 261). She quit taking the medication prescribed in 1992, as she said it was no longer effective in stopping her panic attacks.

Bridgeford testified that she was not able to do the home exercises prescribed by the doctors because they caused her too much pain. Reaching, bending or stooping aggravates her pain. Her husband helps dress and bathe her, and he does most of the household chores. About once every three to four weeks, she drives from Lawrence to Topeka to visit her mother. As for her hobbies, she no longer sews, bowls or gardens. She cannot assist her husband with the yard work. Because of her pain, she stays home more and does not go out as frequently to socialize with friends.

The ALJ asked the vocational expert to assume the following hypothetical person:

Consider that we have a 39–year–old female with a GED education, having relevant past work experience per this record and, additionally, having the following work restrictions and impairments. Cannot bend, stoop or squat, cannot lift more than ten pounds maximum, must be able to sit or stand at will and is otherwise limited to sedentary-type work activities.

(Tr. 277). The vocational expert testified that such a person could do unskilled entry-level sedentary work such as a ticket seller, information clerk, or security monitor. (Tr. 277). When the ALJ modified the hypothetical so that the person needed to lie down during a work day four to five times for up to one hour each time, the vocational expert testified that this restriction would preclude all work activity. Likewise, if headaches interfered with concentration skills, the vocational expert said such a person could not do any kind of gainful work.

**MERITS**

All of Bridgeford's arguments are related to the ALJ's evaluation of her pain testimony and the ALJ's finding that the pain was not disabling. Consequently, the court will address the different arguments at the same time and incorporate the relevant law into a single discussion. At the outset,

Bridgeford argues that the ALJ did not apply the proper standard for evaluating her complaints of pain and that the ALJ erred in determining her credibility. In sum, the plaintiff argues that her pain is disabling pain and that the ALJ may not reject her testimony simply for the lack of medical corroboration.

■ " 'To establish disabling pain without the explicit confirmation of treating physicians may be difficult. Nonetheless, the claimant is entitled to have his nonmedical objective and subjective testimony of pain evaluated by the ALJ and weighed alongside the medical evidence. An ALJ may not ignore the evidence and make no findings.' " *Kepler v. Chater,* 68 F.3d 387, 390 (10th Cir.1995) (quoting *Huston v. Bowen,* 838 F.2d 1125, 1131 (10th Cir.1988) (citations omitted)). In this circuit, the framework for analyzing evidence of disabling pain was set out in *Luna v. Bowen,* 834 F.2d 161 (10th Cir.1987):

> If a pain-producing impairment is demonstrated by objective medical evidence, the decision maker must consider the relationship between the impairment and the pain alleged. "[T]he impairment or abnormality must be one which 'could reasonably be expected to produce' the *alleged* pain." At this stage, the decision maker takes the subjective allegations of pain as true in determining whether they are reasonably related to the proven impairment. He does not evaluate the claimant's credibility. If the nexus between impairment and pain alleged is insufficient, the claimant cannot receive benefits based upon disabling pain. If an appropriate nexus does exist, the decision maker must then consider all the evidence presented to determine whether the claimant's pain is in fact disabling. This evidence includes the medical data previously presented, any other objective indications of the degree of the pain, and subjective accounts of the severity of the claimant's pain. Only at this point may the decision maker decide whether he believes the claimant's assertions of severe pain.

*Id.* at 163. In sum, the court considers: (1) whether the claimant proves with objective medical evidence an impairment that causes pain; (2) if so, whether a "loose nexus" exists between the impairment and the subjective complaints of pain; and (3) if so, whether the pain is disabling based upon all objective and subjective evidence. *Glass v. Shalala,* 43 F.3d 1392, 1395 (10th Cir.1994).

From what is discussed in his written decision, the ALJ implicitly followed the *Luna* framework. The ALJ necessarily found that the claimant's pain passed the first two steps, for he undertook to consider all relevant evidence, subjective and objective, in deciding whether the claimant's pain was disabling. The court in *Luna* explains what is required at the third step:

> By requiring consideration of evidence other than objective medical data, Congress recognized that the severity of pain is inherently subjective.... If objective medical evidence must establish that severe pain exists, subjective testimony serves no purpose at all. A proper reading of the statute appropriately recognizes that two patients with the same impairment may be affected to totally differing degrees.
>
> ....
>
> Requiring consideration of evidence beyond laboratory and test results whenever a loose nexus is established between the pain-causing impairment and the pain alleged does not force decision makers to decide cases based solely on their evaluation of the credibility of the wholly subjective statements of the claimant. Although pain is subjective in that no one can know how much of it a particular nerve stimulus causes another person, many indicators give us some idea how much pain another is feeling.... In previous cases, we have recognized numerous factors in addition to medical test results that agency decision makers should consider when determining the credibility of subjective claims of pain greater than that usually associated with a particular impairment.... Of course no such list can be exhaustive. The point is, however, that expanding the decision maker's inquiry beyond objective medical evidence does not result in a pure credibility determination. The decision maker has a

good deal more than the appearance of the claimant to use in determining whether the claimant's pain is so severe as to be disabling.

834 F.2d at 165–66.

The ALJ listed numerous factors relevant in evaluating Bridgeford's pain testimony. (Tr. 19). The ALJ discussed some of the factors, but not all of them. Though the written decision could have discussed more of the factors in greater detail, the simple failure to do so is not error in itself. *Porter v. Chater*, 895 F.Supp. 1427, 1436 (D.Kan.1995). The ALJ first noted that the impairment had been medically described as a "small recurrent herniated disc," yet the claimant described her pain as constant and severe. He further noted that the treating physicians had opined that Bridgeford's complaints of pain were disproportionate to the objective medical findings. The ALJ acknowledged that the lack of objective evidence is but one factor to consider when evaluating a claimant's pain testimony.

██ None of the treating physicians remarked that Bridgeford was incapable of performing sedentary work. Instead, Dr. Bernhardt recommended vocational rehabilitation so that she could begin some form of sedentary work. Dr. Wertzberger in a letter to the Disability Determination and Referral Services in April of 1993 opined that she could do secretarial work. From what he wrote in January of 1994, Dr. Wertzberger also apparently believed that the claimant's unwillingness "to consider returning to some type of work" was the real problem. (Tr. 231). A treating physician's opinion is entitled to substantial weight and is not to be disregarded unless specific and legitimate reasons are given for doing so. *Williams v. Bowen*, 844 F.2d at 758.

Bridgeford's arguments do not show that the ALJ mistakenly interpreted Dr. Wertzberger's letter opinions or unfairly relied upon them. Though it is true that Dr. Wertzberger signed that part of the ERGOS evaluation which assessed job placement considerations, the form does not state the significance of the physician's signature on it. There is nothing in the record to show that the physician participated with the evaluation or necessarily agreed with its conclusions. If anything, the record suggests that Dr. Wertzberger was reluctant to even refer Bridgeford for such an evaluation. In January of 1994, he refused a referral request from Donald Strole, her worker's compensation attorney in Lawrence. In February of 1994, the claimant visited Wertzberger and personally requested a referral for a work capacity evaluation in Topeka where her social security attorney was located. Dr. Wertzberger's notes from that visit suggest he understood that the evaluation would only reflect her poor attitude towards returning to work: "My feelings have been that it would be good to get her back to some kind of sedentary type job. However, she feels she can do no job at all. That is why she wants to get Work Capacities—in order to have that evaluation." (Tr. 233). The record shows no error in the ALJ not mentioning that Dr. Wertzberger had signed part of the ERGOS evaluation. Nor does the court find error in the ALJ's assessment of the ERGOS evaluation as largely a conclusion "explicitly based on [believing] the claimant's subjective complaints of pain and her self-limiting behavior." (Tr. 20). The ALJ aptly noted that even the evaluators for ERGOS apparently questioned Bridgeford's complaints of disabling pain for they reported that part-time sedentary work was only the "MINIMUM" which the claimant could do.

As to the plaintiff's credibility, the ALJ offered substantial reasons for discounting it. Though Bridgeford's work history had been "fairly stable," the ALJ noted that the prospect of a low-paying, entry-level sedentary job was not much of a financial incentive for the claimant's return to work, since she had received higher wages in her former construction jobs. This factor takes on added significance when considered with the fact that she was only thirty-eight years old at the time.

At the hearing, Bridgeford testified to daily use of medications for the pain, yet she said that none of the medications really helped or provided any relief from the symptoms. From this testimony, the ALJ inferred that if the medications were truly ineffective then Bridgeford would have

stopped using them and/or would have persisted in her efforts to find effective ones. Though maybe a little simplistic, this inference is still reasonable under the circumstances, particularly when considered along side Bridgeford's testimony that she stopped taking the medication for her panic attacks when it became ineffective. In fact, she admitted on her pain questionnaire that the pain medication helped some.

The ALJ observed that Bridgeford testified her pain "was precipitated or aggravated by virtually any activity and that her daily activities were limited." (Tr. 20). On her pain questionnaire, Bridgeford said she walked about a mile every other day, exercised with light stair-stepping twice a week, and cooked one meal every day. In a subsequent pain questionnaire, she wrote that she walked one-half mile twice a week. At the hearing, she testified that her pain was aggravated by just walking more than a block. Also during the hearing, the plaintiff testified that the doctors gave her exercises for home which she was unable to do because of the pain. Dr. Bernhardt's notes from September of 1993 read in part: "She is off narcotics now and has lost a lot of weight because of her exercises that she did diligently." (Tr. 206). At the hearing she testified the pain kept her awake at night, caused restless sleep, and kept her from sleeping not more than the average of four to four and one-half hours a night. On her pain questionnaire, she wrote that she slept nine hours each night and that the pain only occasionally caused her to awaken. The ALJ's "overall impression ... [was] that claimant postured her appearance and testimony at the hearing in such a way as to present a picture of an almost invalid state." (Tr. 21). As the trier of fact, the ALJ is uniquely situated to assess a claimant's condition and demeanor. Consequently, "special deference is traditionally afforded" the ALJ's credibility finding. *Williams v. Bowen,* 844 F.2d at 755 (citation omitted).

It is true that before Bridgeford settled her worker's compensation case in May of 1994, she cooperated with the different medical treatment prescribed for her back and leg pain, and she also visited her treating physicians about the back and leg pain and asked for stronger medication. When the medical bills became her financial responsibility after the settlement, the medical records for the next four months only show refilled prescriptions for the same dosage of Darvocet without any visits to her treating physician or any other physician for stronger or different medication.[3] In addition, the plaintiff testified to frequent severe headaches and panic attacks. The ALJ noted that the medical records did not demonstrate that the claimant had complained of either occurring with the same frequency, duration, and severity to which she testified. In short, there is substantial evidence to support the ALJ's finding that Bridgeford's testimony regarding her pain and other complaints was significantly exaggerated and not credible. "Regardless of whether ... [the court] would have reached a different result based on the record," its review is limited to deciding whether substantial evidence sustains the Secretary's decision. *Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir.1990) (citation omitted).

Bridgeford next speaks of a possible psychological basis for her pain as an explanation for her exaggerated complaints of pain. She, however, does not identify any evidence of record consistent with this new medical theory. Dr. Chediak diagnosed depression, but his report makes no mention that a possible symptom of this condition would be exaggerated complaints of pain. Nor does the plaintiff offer any medical evidence of such a possible nexus or any medical record which suggests that her complaints of pain could have a psychological component. In short, the court will not assume, as the plaintiff does, that there is a psychological component to the plaintiff's complaints of pain.

■ Finally, the claimant argues that the ALJ's hypothetical question did not include all of the plaintiff's impairments and that the

---

**3.** The court understands that the claimant's financial circumstances may have prevented her from considering any additional significant medical treatment after the worker's compensation settlement. Considering the size of her settlement, she could have afforded, however, more than refilled prescriptions of Darvocet if the pain was as debilitating as she testified it was.

vocational expert answered it contrary to Social Security Ruling 85–15[4] which indicates that some bending is required of almost any kind of work. The ALJ need include in his hypothetical question only those alleged impairments that the ALJ accepts as true. *See Talley v. Sullivan,* 908 F.2d 585, 588 (10th Cir.1990). Based on his credibility findings, the ALJ properly withheld from the hypothetical question that the person needed to lie down frequently because of chronic pain and severe headaches.

Social Security Ruling 85–15 reads in pertinent part: "Some stooping (bending the body downward and forward by bending the spine at the waist) is required to do almost any kind of work, particularly when objects below the waist are involved." The claimant's position is that if the ALJ finds a restriction against bending then she is necessarily disabled under Ruling 85–15. The court does not believe this single sentence was meant to be read in that way. Instead, it functions as a generalization that, at most, should cause greater scrutiny when a finding or conclusion contradicts it. Even if it were to be read as the claimant argues, the vocational expert reasonably explained that the different positions involved no or little bending. In addition, while Dr. Wertzberger agreed with the work limitation of "no bending, stooping," he also said that the claimant could do secretarial work and other sedentary jobs. (Tr. 6, 167, 233).

IT IS THEREFORE ORDERED that the plaintiff's motion for order reversing the Secretary's decision (Dk. 7) is denied and the Secretary's decision denying the plaintiff's application for benefits is affirmed. The clerk of the court shall enter judgment affirming the decision of the Secretary/Commissioner.

---

**4.** The claimant cites the ruling number as 85–5, but the court believes the claimant intended to cite 85–15.