Albert D. McKENNEY, Plaintiff,

v.

Kenneth S. APFEL, Commissioner
of Social Security, Defendant.

No. 96–1478–JTM.

United States District Court,
D. Kansas.

Jan. 12, 1999.

Jack R. Shelton, Wichita, KS, for Plaintiff.

Emily B. Metzger, Office of United States Attorney, Wichita, KS , for Defendant.

### MEMORANDUM AND ORDER

MARTEN, District Judge.

This is an action for judicial review of a nondisability determination by plaintiff Albert D. McKenney. McKenney requests the court to reverse the decision of the Secretary and grant him·judgment, or in the alternative, to remand the case to the Secretary for further proceedings. McKenney seeks disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* and supplemental security income (SSI) benefits based on disability under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.* The Commissioner opposes McKenney's motion and argues that the court should affirm the Secretary's determination.

### I. Factual and Procedural Background.

McKenney applied for disability benefits on March 24, 1993, claiming to have become disabled on April 5, 1991. (R. 27–30). McKenney alleges disability due to a back injury, which he suffered while working at Jones Moving and Storage on April 5, 1991. (R. 27).

McKenney's claim was denied initially and upon reconsideration by the Social Security Administration. An Administrative Law Judge held a hearing on November 30, 1994 and denied McKenney's claim on January 25, 1995. The ALJ determined McKenney is unable to perform his past work as a loader/packer for a moving company, roofer, and a self-employed barber, but found that McKenney has the residual functional capacity ("RFC") to perform the full range of sedentary work. (R. 20). The Appeals Council reviewed and denied McKenney's appeal on November 15, 1996. (R. 1–2). Thus, the decision of the ALJ rests as the Secretary's final determination. McKenney subsequently instituted this action.

At the time of the administrative hearing, McKenney was 48 years old. (R. 20). He had a high school education and was licensed as a barber. *Id.* He had worked as a self-employed barber, a loader/packer for a moving company, and a roofer. *Id.*

McKenney injured his back on April 5, 1991, while working as a mover. (R. 14). He was released to return to work in July 1991, but allegedly reinjured his back two days after returning to work. *Id.* He again was released to return to work on July 29, 1991, but was unable to return to work for the moving company. (R. 129). Thereafter, he entered barber training and was licensed in Illinois in January 1993. (R. 14). He worked as a self-employed barber from January 1993 to November 1993. *Id.* At first he worked five days per week, but in May 1993, he reduced his work to three days per week, claiming he had difficulty standing. *Id.* On November 9, 1993, he was involved in a car accident, after which he ceased working completely. *Id.*

## II. Medical Treatment.

After McKenney injured his back on April 5, 1991, he was initially referred to the company doctor, Dr. Wilson. (R. 131). Dr. Wilson x-rayed McKenney's back and introduced him to physical therapy, which McKenney thought made his back worse. *Id.* When McKenney showed no signs of improvement, Dr. Wilson referred him to Dr. Robert L. Eyster, an orthopedic surgeon. *Id.*

In a letter dated October 9, 1991, to McKenney's lawyer, Dr. Eyster stated McKenney had been in his care since May 2, 1991. (R. 129). After Dr. Eyster's initial evaluation, he determined McKenney had no neurologic deficits, and that his examination was "consistent with a probable lower back strain with a possibility of a bulging disk at L4–5." (R. 129). Dr. Eyster reached this conclusion based on a CT scan that indicated there was possibly some mild bulging. *Id.* At that point Dr. Eyster gave McKenney an SI joint injection and had him start physical therapy and extension exercises. *Id.*

Dr. Eyster indicated that by May 16, 1991, McKenney was doing better and he continued to improve through early June. *Id.* On June 12, 1991, Dr. Eyster released McKenney to return to work. *Id.* McKenney returned to see Dr. Eyster on July 1, 1991, displaying increased symptomatology and reduced range of motion. *Id.* McKenney indicated pain that went into the lower back but did not complain of leg or hip pain. *Id.* Dr. Eyster's diagnosis was "lumbosacral strain, and possible continued irritation from the bulging disk." *Id.*

In July 1991, McKenney also began to complain to Dr. Eyster about pain in his elbows. *Id.* Dr. Eyster diagnosed this pain as tendinitis, which was unrelated to his previous back injury. *Id.;* (R. 132). On August 13, 1991, an MRI study of McKenney's lumbar spine showed no herniated disks. (R. 129). Dr. Eyster again released McKenney for work on July 29, 1991, with restrictions. *Id.* However, McKenney was unable to perform the work within the restrictions. *Id.*

In his letter dated October 9, 1991, Dr. Eyster stated he had given McKenney analgesics and an advocation of exercises for both the elbows and the back. *Id.* At that time, Dr. Eyster indicated McKenney remained about the same. *Id.* He was not getting any worse, but was also not im-

proving as much as Dr. Eyster had hoped. *Id.* Dr. Eyster also noted that, in his opinion, surgery was not indicated. *Id.*

As of October 9, 1991, Dr. Eyster's diagnosis was that McKenney had tendinitis around the elbows from overuse and lower back strain. *Id.* Dr. Eyster believed McKenney could work within restrictions, which would make it difficult for him to do the work he had been doing at the moving company. *Id.* He restricted McKenney to "no repetitive lifting over 30 pounds, no single lift over 50 pounds, and no repetitive overuse of his arms bilaterally." *Id.*

Dr. Eyster further indicated that if McKenney's pain in his lower back persisted, he would have a "2% impairment rating to the back and a 1% impairment rating to the arms bilaterally, for a total of a 3% impairment rating to the body as a whole, based on the guidelines set by the AMA." (R. 130). Eyster stated that he believed if McKenney would continue to do stretching exercises, he would eventually get over his current symptoms, but he may always experience difficulty doing the heavier work activities required at the moving company. *Id.*

Dr. Daniel D. Zimmerman, a specialist in internal medicine, performed a consultative examination of McKenney on April 15, 1992. (R. 131). During his consultation with Dr. Zimmerman, McKenney indicated back pain that radiated toward his right hip. (R. 132). McKenney indicated to Dr. Zimmerman that he could sit 15 to 20 minutes before he needed to change positions and that he could stand for 20 to 30 minutes before he needed to get off his feet due to pain and discomfort. *Id.* McKenney indicated that he used ice packs to reduce his pain and discomfort in his back. (R. 133). At the time of Dr. Zimmerman's consultation, McKenney was not using any pain medication. *Id.*

In summarizing McKenney's condition, Dr. Zimmerman indicated McKenney has significant pathology at the lumbosacral spine level. *Id.* Review of the CT scan of the lumbosacral spine "demonstrated significant abnormalities affecting the facet joints with evidence of disc bulging at L4–L5." *Id.* Dr. Zimmerman's findings indicated that McKenney continued to have pain and discomfort "affecting the lumbosacral spine with radicular symptoms affecting the right lower extremity." *Id.* This condition caused "permanent partial disability of the body as a whole which should be rated at 16 percent." *Id.* Dr. Zimmerman's disability rating was based on the Third Edition (Revised) *AMA Guides to the Evaluation of Permanent Impairment.* (R. 135). Dr. Zimmerman concluded that McKenney should be restricted to "lift no more than 20 pounds on an occasional basis, 10 pounds on a frequent basis." *Id.* He also indicated McKenney should avoid frequent bending, twisting, stooping, and crawling. *Id.*

In conclusion, Dr. Zimmerman stated that he believed McKenney's condition was stable and that no further diagnostic or therapeutic intervention was warranted. *Id.* Dr. Zimmerman indicated McKenney could seek relief from his pain and discomfort by using ice, hot packs, hot tub baths, and hot showers. *Id.* He further indicated that non-steroidal anti-inflammatory medication may be necessary for pain relief for the foreseeable future. *Id.* In Dr. Zimmerman's opinion, McKenney could not return to the work he had previously performed, but he could engage in other sedentary activities. *Id.*

Dr. M.A. Paniagua also performed a consultative examination of McKenney on June 16, 1993. (R. 145). At this examination, McKenney indicated to Dr. Paniagua his pain was persistently a 7 out of 10, on a scale of 0 to 10, and aggravated to a 9 out of 10 with activity. *Id.* McKenney complained that he had no feeling in his right leg and that he had sharp pains in his right shoulder and elbow. *Id.* At this point in time, which was before his automobile accident, McKenney indicated his activities included walking five blocks, standing for 45 minutes, sitting for 10 to 15 minutes, and lying down for 3 to 4 hours. *Id.* McKenney was unable to pull,

push, lift, or carry anything heavier than 20 pounds and experienced difficulty with bending and reaching over his head. (R. 146). In summary, Dr. Paniagua found McKenney suffered from the following:

1. Lower back pain syndrome, post traumatic with permanent sensory neurological deficits impairing his ambulation and causing a recurrence and aggravation of pain with activities of daily living.

2. Acute external epicondylitis of the right elbow.

3. Bicipital tendonitis, acute, of right shoulder.

*Id.* Dr. Paniagua did not indicate whether McKenney was capable of performing any work activities.

Dr. Walt Mutschler was the physician who examined McKenney on November 9, 1993, after his automobile accident. (R. 153). Paramedics brought McKenney to the hospital complaining of lower back pain and decreased sensation in his right lower leg. *Id.* Dr. Mutschler indicated that upon examination, McKenney's back was not palpably deformed or tender, but that McKenney complained of pain across his lower lumbar area. (R. 154). Dr. Mutschler examined McKenney's extremities and found that McKenney had decreased sensation in his right lower leg, but that his other three extremities were normal. *Id.* Spinal x-rays revealed no fractures and no acute changes. *Id.* McKenney did, however, appear to have mild arthritic changes. *Id.* Dr. Mutschler ultimately diagnosed McKenney as having acute lumbar back pain and prescribed two medications for him to reduce his pain and discomfort.[1] *Id.* Mutschler advised McKenney to resume his activities as tolerated. (R. 155).

After his automobile accident, McKenney sought care from Dr. Bruce Vest, an orthopedic surgeon. (R. 159). Dr. Vest examined McKenney on November 12, 1993, three days after the automobile accident. (R. 160). Dr. Vest reviewed an MRI scan performed on McKenney's spine and noted McKenney suffered from degenerative disc disease throughout his lumbar spine. *Id.* He also noted bulging discs at L4–5 and L5–S1. *Id.* Like the prior x-ray taken immediately after the accident, the MRI indicated no signs of fracture. *Id.* Dr. Vest gave McKenney samples of Naprosyn and a prescription for Prednisone and told him to use heat on his back. *Id.* He also offered him a prescription for physical therapy, but McKenney declined it. *Id.*

Dr. Vest saw McKenney two weeks later, on November 29, 1993, and McKenney indicated his back pain was considerably less than it had been two weeks earlier. (R. 161). McKenney was able to stand more erect, but he still lacked about 10 degrees of full lumbar extension. *Id.* McKenney continued to experience decreased sensation in his lower right leg. *Id.* Dr. Vest gave McKenney more samples of Naprosyn and again offered him physical therapy, which McKenney again declined, stating his prior treatment with physical therapy had only aggravated his back pain. *Id.*

Dr. Vest saw McKenney four weeks later on December 27, 1993, at which time McKenney continued to suffer from back pain. (R. 162). McKenney indicated his pain increased after sitting or riding in a car, but did not indicate his need to lie down after being up for extended periods of time. *Id.* He also experienced difficulty bending forward and standing fully erect. *Id.* Dr. Vest indicated McKenney showed an improved condition of his acute lumbar strain. *Id.* He gave McKenney samples of Lodine, because McKenney did not have money to buy medication. *Id.* He also encouraged McKenney to try to walk for exercise. *Id.*

Dr. Vest saw McKenney for the last time on January 31, 1994. (R. 163). At this follow-up examination, McKenney indicated his level of pain had returned to its

---

1. Dr. Vest's report of November 12, 1993 indicates McKenney did not have the pre-scriptions filled because he lacked the funds to do so. (R. 159).

previous baseline level prior to the automobile accident. *Id.* Dr. Vest indicated in his records that McKenney continued to suffer chronic degenerative disc disease of the lumbar spine, bulging discs at L4–5 and LS–S1, but that his acute lumbar strain had been resolved. *Id.* Dr. Vest released McKenney from his care and indicated he would be seen in follow-up only as needed. *Id.* Dr. Vest indicated no surgical treatment was needed and that it would not prove beneficial. *Id.*

McKenney did not see Dr. Vest again after his appointment on January 31, 1994. (R. 192). At the time of the hearing before the ALJ, McKenney was not seeing any physician for his back problems. *Id.* He was, however, seeing Dr. Diaz, his family physician, for a hiatal hernia and his nerves. *Id.* He also indicated at the hearing that he was taking Naprosyn twice a day. (R. 192–93). He claimed this gave him some relief, but not much. (R. 193).

The ALJ found McKenney's allegation that his "musculoskeletal impairment prevents him from engaging in all sustained work activity is not found to be credible or supported by the weight of the evidence." (R. 14). The primary reasons stated for the ALJ's decision were (1) McKenney had not received ongoing medical treatment; (2) he had not been taking potent pain-relieving medication; and (3) no physician had stated that he is totally disabled.

### III. Standard of Review

The court's standard of review is set forth in 42 U.S.C. § 405(g), which provides that "[t]he findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive...." Substantial evidence is that evidence which a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Fowler v. Bowen,* 876 F.2d 1451, 1453 (10th Cir.1989). It is not the court's duty to reweigh the evidence, or substitute its decision for that of the ALJ. *Talbot v. Heckler,* 814 F.2d 1456, 1461 (10th Cir.1987). However, substantial evidence must be more than a mere

scintilla. *Perales,* 402 U.S. at 403, 91 S.Ct. 1420. This court's determination consists of a review of "the record as a whole, and 'the substantiality of the evidence must take into account whatever in the record fairly detracts from its weight.'" *Talbot,* 814 F.2d at 1461. (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951)). In applying the above standards, the court must keep in mind the purpose of the Social Security Act, which is to alleviate some of the rigors of life for those who are disabled or impoverished. *Dvorak v. Celebrezze,* 345 F.2d 894, 897 (10th Cir.1965).

In evaluating claims of disability, the Secretary utilizes a five-step process. *Kemp v. Bowen,* 816 F.2d 1469, 1474 (10th Cir.1987). If at any point during the five-step inquiry the Secretary determines whether or not the claimant is disabled, the process comes to an end.

First, the Secretary determines whether the claimant is currently engaged in substantial gainful activity. *Id.* If not, the inquiry continues; if so, the claimant is not disabled and the inquiry is over. In this case, McKenney had not worked since his automobile accident on November 9, 1993. (R. 14). Therefore, the ALJ continued to the next inquiry.

Second, the fact finder considers whether "the claimant [has] a severe impairment which significantly limits his physical or mental ability to do basic work activities." *Kemp,* 816 F.2d at 1474. In this case, the ALJ found that McKenney's history of chronic lower back pain was a severe impairment, as defined in the Social Security Act. (R. 14).

Third, the fact finder must determine whether the impairment is equivalent to one of a number of impairments found in the "Listing of Impairments," 20 C.F.R. Part 404, Subpt. P, App. 1, which the Secretary recognizes are so severe as to preclude substantial gainful activity. *Kemp,* 816 F.2d at 1474. If the impairment is equivalent to one of the impairments found in the list, and "if it has lasted

or can be expected to last for at least 12 months, the person is considered disabled and there is no need to proceed further." *Id.* If no equivalency is presented, the claimant must show that because of the impairment, he is unable to perform his past employment. *Id.* at 1474–75. In this case, the ALJ found McKenney's impairment did not meet or equal a listed impairment contained in the "Listing of Impairments." (R. 14). However, McKenney did convince the ALJ that he could no longer perform his past employment because of his impairment. (R. 18).

Finally, if the claimant cannot return to his past work, the fact finder must determine whether the claimant has the RFC to perform other work available in the national economy, considering such factors as age, education, and past work experience. *Kemp*, 816 F.2d at 1475. The burden is on the Secretary to show the claimant retains the ability to do other work activity and that jobs the claimant could perform exist in the national economy. *Sorenson v. Bowen*, 888 F.2d 706, 710 (10th Cir.1989). "The Secretary meets this burden if the decision is supported by substantial evidence." *Id.* (quoting *Ray v. Bowen*, 865 F.2d 222, 224 (10th Cir.1989)).

In this case, the ALJ denied McKenney's claim at step five, concluding McKenney possesses the RFC for a full range of sedentary work.[2] (R. 20). The ALJ did not rely upon the testimony of a vocational expert in determining the existence of available employment. Instead, he relied upon the Medical Vocational Guidelines ("the grids"),[3] which was proper because of McKenney's lack of nonexertional limitations.[4] *Thompson v. Sullivan*, 987 F.2d 1482, 1488 (10th Cir.1993); *Trimiar v. Sullivan*, 966 F.2d 1326, 1332 (10th Cir.1992); *Hargis v. Sullivan*, 945 F.2d 1482, 1490 (10th Cir.1991).

The grids, which are prepared by the Secretary, evaluate a claimant's ability to work by matching the claimant's age, education, and work experience with his work capability. *Trimiar*, 966 F.2d at 1332. They " 'help evaluate whether there exist sufficient jobs that can be performed given the claimant's age, education, and physical limitations.' " *Id.* (quoting *Hargis*, 945 F.2d at 1490). The grids constitute a shortcut that eliminates the need to call vocational experts. *Id.* They "set forth presumptions regarding whether jobs exist in significant numbers in the national economy given the particular limitations possessed by the claimant." *Id.* (footnote omitted).

If the claimant possesses nonexertional limitations, the grids alone cannot be used to determine the claimant's ability to perform alternative work. *Id.* at 1333. However, because McKenney does not exhibit any nonexertional limitations, the ALJ correctly relied on the grids. *Id.*

McKenney claims the ALJ did not give proper weight to the opinions of his treating physicians; rationalized, allegedly without legal basis, the reason for McKenney not working, *i.e.*, the fact he was involved in litigation relating to the automobile accident; failed to use a proper legal

---

**2.** Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.
20 C.F.R. § 404.1567(a). "Sedentary work is the lowest grade of work recognized by the regulations." *Manning v. Secretary of Health and Human Services*, 810 F.Supp. 1220, 1224 (D.Kan.1993).

**3.** See 20 C.F.R. pt. 404, Subpt. P, App. 2.

**4.** "Nonexertional limitations may include or stem from sensory impairments; epilepsy; mental impairments, such as the inability to understand, to carry out and remember instructions, and to respond appropriately in a work setting; postural and manipulative disabilities; psychiatric disorders; chronic alcoholism; drug dependence; dizziness; and pain." *Williams v. Bowen*, 844 F.2d 748, 752 (10th Cir.1988).

test to determine if McKenney's pain is disabling; and overstepped his boundary by substituting his own medical opinion.

## IV. Analysis.

### A. Disabling Pain.

■ The Tenth Circuit has provided a framework under which claims of disabling pain are to be analyzed. *Luna v. Bowen*, 834 F.2d 161, 163 (10th Cir.1987). Under *Luna*, the ALJ must first determine whether a given impairment could be reasonably expected to produce the type and degree of pain indicated by a claimant. *Id.* Only a loose nexus between the impairment and the claimed pain is required at this point in the inquiry. *Id.* If an impairment is reasonably expected to produce some pain, allegations of disabling pain stemming from that impairment are sufficiently consistent to continue to the second step. *Id.* at 164. At the second step, the decision maker is to consider all the evidence to determine whether the claimant's pain is disabling. *Id.* It is only at this second step that the decision maker may consider the credibility of the claimant's assertions of severe pain. *Id.* In considering the credibility of the claimant's subjective allegations of pain, the ALJ must consider the following factors:

> the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.

*Hargis*, 945 F.2d at 1489.

■ The court finds substantial evidence exists to uphold the ALJ's determination that McKenney's pain is not disabling. The ALJ based his determination on various relevant facts. In rendering his decision, the ALJ noted McKenney's failure to receive ongoing medical treatment for his back problem and his failure to take potent pain medication. (R. 14). Once McKenney had his last appointment with Dr. Eyster in August 1991, he did not see another physician until April 15, 1992, when he saw Dr. Zimmerman, who was not a treating physician. (R. 129–35). In addition, at the time of the hearing on November 30, 1994, McKenney had not seen a physician for his back, leg and arm problems since January 31, 1994, when Dr. Vest released him from his care. (R. 192).

Dr. Mutschler and Dr. Vest both prescribed pain relievers, but McKenney did not fill the prescriptions, claiming he did not have the funds to do so. There is no indication McKenney ever tried to apply for aid in order to obtain these prescriptions. Therefore, there is no way to determine the effectiveness of the drugs physicians tried to prescribe. Dr. Eyster also indicated that if McKenney would continue to do stretching exercises, he would eventually get over his symptoms. (R. 130). However, there is no indication McKenney attempted to do the stretching exercises. Furthermore, McKenney declined physical therapy when several doctors indicated such therapy would help his condition.

The ALJ also stated McKenney never told his treating or examining physicians about having to lie down after being up 2 to 3 hours. (R. 15). Dr. Paniagua noted in his report that McKenney "remain[ed] in the supine position for three to four hours" during his daily activity. (R. 145–46). However, neither Dr. Eyster nor Dr. Vest, McKenney's treating physicians, ever indicated in their reports that McKenney had to lie down after being up for extended periods of time. In the ALJ's opinion, McKenney's allegation that he had to lie down after being up 2 to 3 hours lacked credibility. (R. 18).

Also of relevance to the ALJ was McKenney's claim to Dr. Paniagua that his pain persistently was a 7 out of 10 on a 0 to 10 point scale and 9 out of 10 when he engaged in activity. (R. 16). In the ALJ's opinion, McKenney was exaggerating his

pain levels, considering his daily activities at the time he met with Dr. Paniagua. *Id.* At the time McKenney saw Dr. Paniagua, he was working at least three days a week as a barber. *Id.* If McKenney was suffering level 9 pain, as he claimed, one would doubt his ability to work as a barber.

The ALJ further emphasized that no physician has ever stated McKenney is totally disabled and unable to work. (R. 14). He also noted that no one testified on McKenney's behalf at the hearing. (R. 17).

McKenney argues the ALJ improperly inserted his own medical opinion in his determination that McKenney is not disabled. The court finds no evidence in the record to support this assertion.

**B. Treating Physicians' Opinions.**

The Secretary must give substantial weight to the evidence and opinions presented by the claimant's treating physicians, unless good cause is shown for rejecting such evidence or opinions. *Sorenson*, 888 F.2d at 711. "Opinions of physicians 'who have treated a patient over a period of time or who are consulted for purposes of treatment are given greater weight than are reports of physicians employed and paid by the government for the purpose of defending against a disability claim.'" *Id.* (quoting *Broadbent v. Harris*, 698 F.2d 407, 412 (10th Cir.1983)).

The court finds that the ALJ gave proper consideration to McKenney's treating physicians' opinions. Dr. Vest released him with no restrictions and Dr. Eyster released him with only certain weight restrictions. Few, if any, discrepancies exist in the opinions of the physicians who observed McKenney. All seem to think he is unable to perform the type of work he had been doing. However, none of them state he is unable to perform any work. Dr. Eyster said "only time will tell whether he can improve to the point where he could do that job," meaning his moving job. (R. 130). Dr. Vest released McKenney from his care in January 1994, indicating no restrictions on McKenney's

activities. (R. 163). Dr. Zimmerman indicated McKenney could not return to his previous work, but could perform sedentary work. (R. 135). Dr. Paniagua did not indicate any work restrictions. Finally, none of McKenney's treating physicians, indeed, none of the several physicians who saw McKenney, whether or not treating physicians, claimed he is incapable of performing all work.

**C. McKenney's Pending Litigation.**

McKenney further argues the ALJ improperly considered his pending litigation in determining his motivation for not working. This determination goes to McKenney's credibility. This district has evaluated financial incentives in the past to make credibility determinations. *See Bridgeford v. Chater*, 922 F.Supp. 449, 459 (D.Kan.1995) ("the prospect of a low-paying, entry-level sedentary job was not much of a financial incentive for the claimant's return to work, since she had received higher wages in her former construction jobs"); *see also Kisling v. Chater*, 105 F.3d 1255, 1256 (8th Cir.1997) (discrediting claimant's credibility because of her therapist's view that claimant's motivation to work was suspect); *Gaddis v. Chater*, 76 F.3d 893, 895–96 (8th Cir.1996) (claimant seeking disability benefits filed a lawsuit against his former employer; the court stated, "We agree with the ALJ that there is a 'strong element of secondary gain in this case' and that Gaddis' conduct belies his sincere belief that he is truly disabled and unable to perform any substantial gainful activity."). Although McKenney's pending litigation should not be the sole factor in determining his credibility, it was proper for the ALJ to consider with the evidence as a whole.

In conclusion, this court affirms the ALJ's determination that McKenney is not disabled within the meaning of the Social Security Act. The ALJ's determination is supported by substantial evidence and reflects application of the correct legal standards.

IT IS THEREFORE ORDERED this 12th day of January, 1999, that McKenney's motion for summary judgment reversing the decision of the Secretary, or in the alternative, to remand the case to the Secretary for further proceedings (dkt. no. 8) is denied.