**Patricia Gail NICHOLS, Plaintiff,**

v.

**COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, Defendant.**

**No. CIV.A. 01–2370–DJW.**

United States District Court, D. Kansas.

March 31, 2003.

Ross E. Stubblefield, Blue Springs, MO, for Plaintiff.

David D. Zimmerman, Melanie D. Caro, Office of U.S. Attorney, Kansas City, KS, for Defendant.

### *MEMORANDUM AND ORDER*

WAXSE, United States Magistrate Judge.

Plaintiff seeks judicial review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of the final decision of Defendant Commissioner of the Social Security Administration ("Commissioner") denying her applications for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1602 and

1614(a)(3)(A). The parties have filed their consent to jurisdiction by Magistrate Judge, pursuant to 28 U.S.C. § 636(c)(1) and Fed.R.Civ.P. 73 (doc. 19). Plaintiff has filed a brief (doc. 13) seeking judicial review of the Commissioner's decision. The Commissioner has filed a brief in opposition (doc. 15), and Plaintiff has filed a reply (doc. 20).

The Court has reviewed the administrative record and the briefs of both parties. As set forth below, the Court reverses the decision of the Commissioner and remands the case to the administrative law judge for further proceedings consistent with this decision.

## I. Standard of Review

■ Pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), a court may render "upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." The court reviews the decision of the Commissioner to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision.[1] The Supreme Court has held that "substantial evidence" is "more than a mere scintilla" and is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[2] In reviewing the record to determine whether substantial evidence supports the Commissioner's decision, the court may neither reweigh the evidence nor substitute its discretion for that of the Commissioner.[3] Evidence is not considered substantial "if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion."[4]

■ The court also reviews the decision of the Commissioner to determine whether the Commissioner applied the correct legal standards.[5] The Commissioner's failure to apply the proper legal standard may be sufficient grounds for reversal independent of the substantial evidence analysis.[6]

Accordingly, the court reviews the decision of the Commissioner to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and to determine whether the correct legal standards were applied.[7]

## II. Procedural History

On September 30, 1997, Plaintiff filed an application for supplemental security income benefits based on disability under Title XVI. (*See* Certified Transcript of the Record ("Tr.") at 107, 150–55.) The Commissioner denied the claims initially and upon reconsideration. (Tr. 109, 116–19.) On April 2, 1999, the Administrative Law

1. *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir.1994).

2. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971).

3. *Qualls v. Apfel*, 206 F.3d 1368, 1371 (10th Cir.2000) (citing *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

4. *Knipe v. Heckler*, 755 F.2d 141, 145 (10th Cir.1985) (quoting *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983)).

5. *Glass v. Shalala*, 43 F.3d 1392, 1395 (10th Cir.1994); *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir.1994).

6. *Glass*, 43 F.3d at 1395 (citing *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993)).

7. *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1497 (10th Cir.1992).

Judge ("ALJ") conducted a hearing on Plaintiff's claim. (Tr. 45–87.) A supplemental hearing was held on July 20, 1999 to hear testimony from a vocational expert. (Tr. 88–106.) Plaintiff appeared in person and with her attorney at the first hearing (Tr. 45), and through her attorney at the supplemental hearing (Tr. 88, 90).

On August 17, 1999, the ALJ issued his decision, in which he concluded that Plaintiff was not disabled within the meaning of the Social Security Act and was therefore not entitled to receive supplemental security income benefits. (Tr. 29–40.) In reaching this conclusion, the ALJ determined that Plaintiff's impairments did not prevent her from performing work that exists in significant numbers in the national economy, including employment as a plastic parts assembler, small parts assembler, and hand packer. (Tr. 40.)

On September 13, 1999, Plaintiff requested a review of the hearing decision by the Appeals Council (Tr. 23–25), which was denied by the Appeals Council on June 8, 2001 (Tr. 6–7). The findings of the ALJ therefore stand as the final decision of the Commissioner in this case.

Plaintiff alleges in her application for supplemental security income benefits that she became disabled and eligible to receive benefits on December 20, 1989, due to post traumatic stress disorder and depression. (Tr. 158.) At the time of the hearing before the ALJ, Plaintiff was 39 years of age. (Tr. 30, 150.) Under the Social Security regulations, Plaintiff is classified as a "younger" individual.[8] Plaintiff has three years of college. (Tr. 162.) Plaintiff has no other formal education or training. Plaintiff's past relevant work includes working as a housekeeper, childcare teacher, fast food worker, and waitress. (Tr. 186–173, 225.) She ceased all work activi-

ty on December 20, 1989, the alleged onset date of her disability. (Tr. 150, 158.)

## III. The ALJ's Findings

In his decision of August 17, 1999, the ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since December 20, 1989.

2. The medical evidence established that the claimant is morbidly obese and has an affective disorder and an anxiety disorder, impairments which are severe but which do not meet or equal the criteria of any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4.

3. The claimant's statements concerning her impairments and their impact on her ability to work are credible only insofar as they preclude her from engaging in work activity exceeding the residual functional capacity set forth below.

4. The claimant is moderately limited in the ability to understand and remember detailed instructions; perform activities within a schedule, maintain regular work attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.

5. The claimant is unable to perform her past relevant work as house-

8. *See* 20 C.F.R. § 416.963(b) (1999).

keeper, child care teacher, fast food worker, and waitress.

6. The claimant is 39 years old, a "younger individual age 18–44."

7. The claimant has three years of college.

8. The claimant has semi-skilled work experience but has acquired no transferable work skills.

9. Considering the claimant's age, educational background, and residual functional capacity, she is able to make a successful vocational adjustment to work which exists in significant numbers in the national economy. Such work includes employment as plastic parts assembler, small parts assembler, and hand packer.

10. The claimant has not been under a disability, as defined in the Social Security Act, at any time through the date of this decision.

(Tr. 39–40.)

## IV. Analysis and Discussion

### A. The ALJ's Evaluation of the Opinions Expressed in the Medical Source Statement and Nurse Practitioner Heller's July 1999 Letter

Plaintiff first argues that the ALJ failed to give proper weight to the opinions of Faye Heller, CS, ARNP, CST, CST, and George Thompson, M.D., both of whom were affiliated with the Menninger Clinic. Plaintiff also argues that the ALJ failed to give proper weight to the opinions contained in Ms. Heller's July 1999 letter to Plaintiff's attorney.

### 1. The Medical Source Statement

Specifically, Plaintiff argues that the ALJ did not give sufficient weight to, and improperly discredited, the opinions set forth in a "Medical Source Statement–Mental" from Menninger Clinic ("Medical Source Statement"). (*See* Tr. 466–67.) That statement was signed by Nurse Practitioner Heller on April 15, 1999 and by Dr. Thompson on April 26, 1999. In the Medical Source Statement, Ms. Heller opined that Plaintiff's abilities were "markedly limited" in various respects, including the ability to understand, remember and carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, complete a normal workday and workweek without interruption from psychologically-based symptoms, accept instructions and respond appropriately to criticism from supervisors, and get along with coworkers. (Tr. 466–67.) Ms. Heller also opined in the Medical Source Statement that Plaintiff was "moderately limited" in other respects, including the ability to understand, remember and carry out very short and simple instructions, interact appropriately with the public, maintain socially appropriate behavior, and be aware of normal hazards and take appropriate precautions. (Tr. 466–67.) She also opined that Plaintiff was "not significantly limited" in the ability to ask simple questions or request assistance. (Tr. 466–67.) Nurse Practitioner Heller concluded: "This woman has many health problems whose symptoms need to be in remission before she could work (e.g. post traumatic stress disorder, morbid obesity[,] major depression)." (Tr. 467.)

Plaintiff contends that the ALJ erred when he discredited the Medical Source Statement on the basis that it was signed only by Ms. Heller. Plaintiff states that the Medical Source Statement was also signed by Dr. George Thompson who, as a physician, qualifies as a treating source.

The ALJ stated in his decision: "Ms. Heller, a nurse practitioner, does not meet the definition of a 'treating source' within

the Regulations. As her treatment of the claimant provides the only medical evidence or record pertaining to the claimant's alleged mental impairment, her medication check progress notes are afforded appropriate weight in this case; however her conclusions [contained in the Medical Source Statement and elsewhere] cannot be afforded controlling weight." (Tr. 37.)

The Court does not find that the ALJ erred in rejecting the opinions set forth in the Medical Source Statement. 20 C.F.R. § 416.913 (1999)[9] governs "medical source statements" such as the one at issue here. It provides that the statement must be based on the findings of an "acceptable medical source."[10] The regulation provides that the agency generally will give more weight to "medical opinions" from treating sources than those from non-treating sources.[11] "Medical opinions" are defined as "statements from physicians and psychologists or *other acceptable medical sources* that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental restrictions."[12]

The term "acceptable medical sources" is defined to include (1) licensed physi-cians, (2) licensed osteopaths, (3) licensed or certified psychologists, (4) licensed optometrists, (5) persons authorized to send the Secretary a copy or summary of the medical records of a hospital or other institution, and (6) the "report of an interdisciplinary team that contains the evaluation and signature of an acceptable medical source."[13] Nurse practitioners are not included in the list of "acceptable medical sources."[14]

■ In light of the above, Ms. Heller, standing alone as a nurse practitioner, is not an acceptable medical source. The ALJ was therefore not required to apply the treating source rule when weighing her opinions.[15] Plaintiff asserts, however, that the Medical Source Statement was also signed by Dr. Thompson, who is a licensed physician. Plaintiff thus argues that the opinion contained in the Medical Source Statement came from an "acceptable medical source," and the ALJ was required to give it controlling weight.

The Court does not agree. The Court finds the Ninth Circuit's decision in *Gomez v. Chater*,[16] to be instructive on this issue. In that case, the Ninth Circuit analyzed the term "interdisciplinary team" and held that a nurse practitioner working in conjunction with a physician constitutes an

---

**9.** Unless otherwise indicated, the Court will apply the regulations that were in effect at the time the ALJ made his decision in August 1999.

**10.** 20 C.F.R. § 416.913(a) and (b)(6) (1999).

**11.** 20 C.F.R. § 416.927(d)(2) (1999).

**12.** 20 C.F.R. § 416.927(a)(2) (1999) (emphasis added).

**13.** 20 C.F.R. § 416.913(a) (1999).

**14.** *Gomez v. Chater,* 74 F.3d 967, 970 (9th Cir.1996).

**15.** *See Hartranft v. Apfel,* 181 F.3d 358, 361 (3d Cir.1999) (holding that opinion of chiropractor, who is not listed as an acceptable medical source under 20 C.F.R. § 416.913, is not entitled to controlling weight under treating physician rule); *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 530 (6th Cir.1997) (ALJ not required to adopt the opinions of a treating chiropractor or give them controlling weight because a chiropractor is not an acceptable medical source under the regulations); *Diaz v. Shalala,* 59 F.3d 307, 313 (2d Cir.1995) (Secretary not required to give controlling weight to a chiropractor's opinion since chiropractor is not an acceptable medical source).

**16.** 74 F.3d 967 (9th Cir.1996).

acceptable medical source, while a nurse practitioner working on his or her own does not.[17] The Court ruled that the opinion of the nurse practitioner in that case should be considered an opinion of an acceptable medical source because the nurse practitioner had consulted with the physician regarding the claimant's treatment numerous times over the course of her relationship with the claimant and had worked closely under the supervision of the physician.[18] The court further observed that the nurse practitioner was acting as an agent of the physician in connection with her relationship to the claimant.[19]

Those facts are not present here. There is no evidence in the record indicating that Ms. Heller was working closely under the supervision of Dr. Thompson or that she had consulted with Dr. Thompson during the course of Plaintiff's treatment. Moreover, there is nothing in the record indicating that Plaintiff was ever seen or treated by Dr. Thompson.[20] Finally, there is nothing in the Medical Source Statement indicating that it was based on any evaluation conducted by Dr. Thompson as required by 20 C.F.R. § 416.913(a)(6) (1999). As noted above, that regulation requires the report of an interdisciplinary team to contain more than just the signature of the acceptable medical source—it requires the report to contain *the evaluation* of the acceptable medical source.[21]

■ Here, the record show only the co-signing of the report by Dr. Thompson. The mere co-signing of the report does not create an interdisciplinary team within the meaning of the regulation. Consequently, the opinions contained in the Medical Source Statement can only be attributed to Ms. Heller. As a nurse practitioner, she is not an acceptable medical source, and the ALJ was not required to give her opinions controlling weight. Instead, the ALJ had discretion to determine what weight to give Ms. Heller's opinions based on all the evidence before him.[22] The ALJ chose to give Ms. Heller's opinion from the Medical Source Statement little weight. The ALJ did not err in choosing to give greater weight to other evidence, i.e., the opinion of E. Robert Sinnett, M.D., who examined Plaintiff on April 30, 1999 and who is an acceptable medical source (*see* Tr. 468–69), and the opinion of George Chance, Ph.D., who testified at the administrative hearing as a consulting expert (*see* Tr. 61–77).

■ Even assuming arguendo that the ALJ should have considered the Medical Source Statement to be prepared by an acceptable medical source, the Court holds that the ALJ did not err in declining to give the opinions contained therein substantial weight. It is well settled that the ALJ may reject a treating source's opinion if the opinion is (1) not supported by specific findings,[23] (2) not supported by clinical

---

**17.** *Id.* at 971.

**18.** *Id.*

**19.** *Id.*

**20.** *See* Soc. Sec. Rul. 96–5p, 1996 WL 374183, at *4 (clarifying that medical source statements must be submitted by acceptable medical sources and based on the medical source's personal knowledge of the claimant).

**21.** 20 C.F.R. § 416.913(a)(6) (1999) ("the report of an interdisciplinary team that contains the evaluation and signature of an acceptable

medical source is also considered acceptable medical evidence.")

**22.** *See Walters,* 127 F.3d at 530; *Diaz,* 59 F.3d at 314; *see also Cronkhite v. Sullivan,* 935 F.2d 133, 134 (8th Cir.1991) (holding that "ALJ properly gave little weight to the opinions of [claimant's] chiropractors because such evidence is not considered an 'acceptable source' of medical information to prove disability").

**23.** *Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1029 (10th Cir.1994).

and/or laboratory diagnostic techniques,[24] (3) inconsistent with other substantial evidence in the record,[25] or (4) brief, conclusory, and unsupported by medical evidence.[26]

Here, the opinions expressed by Nurse Practitioner Heller in the Medical Source Statement were not supported by Ms. Heller's own medication management progress notes ("progress notes"). Ms. Heller met with Plaintiff on a periodic basis to monitor her progress on medication. Her progress notes generally reflect that Plaintiff's symptoms were in remission on medication. On April 24, 1996, Plaintiff reported to Ms. Heller that "there has been increased remission of symptoms with the increase of the Paxil." (Tr. 377.) On January 6, 1997, Plaintiff reported that "she is doing well without a return of symptoms with no side effects." (Tr. 373.) Ms. Heller's progress notes from April 21, 1997 state that "medication really appears to me to maintain symptoms in remission without side effects. [Plaintiff] reports that also." (Tr. 372.) Ms. Heller's progress notes from July 15, 1997 state: "Medication maintained symptoms in remission without side effect." (Tr. 371.) They also state that "medication placed symptoms in remission to the point that she would be able to make better use of a therapeutic process if that were possible." (Tr. 371.) The progress report from November 24, 1997 state: "Medication maintains symptoms in remission at varying intervals. Exacerbation seems to come more when there are family difficulties." (Tr. 389.) On March 23, 1998, the progress notes reflect that Plaintiff "perceives that the medication is helping her the best that [sic] anything else." (Tr. 464.) Nurse Practitioner Heller assessed: "Medication

maintains symptoms in remission and without side effects to the point that she can at least function and accomplish what needs to be done each day." (Tr. 465.) On July 6, 1998, the progress notes state that Plaintiff "reports that the medication continues to maintain symptoms in remission." (Tr. 462.) Ms. Heller writes: "Medication is maintaining symptoms in remission, without side effects, to the point I receive a lot fewer in between office visit calls, and she was calmer here in the office." (Tr. 463.) In her progress notes from October 21, 1998, Ms. Heller states that "[m]edication at this level appears to help as much as can be possible without a psychotherapy process also." (Tr. 461.)

For all of the above reasons, the Court holds that it was proper for the ALJ to give little or no weight to the opinions expressed in the Medical Source Statement and finds no basis for reversing the ALJ's decision on this basis.

### 2. The July 1999 letter from Nurse Practitioner Heller

Plaintiff also argues that the ALJ erred in not giving weight to a July 1999 letter from Nurse Practitioner Heller to Plaintiff's attorney.[27] In that letter, Ms. Heller disagreed with various conclusions drawn by Dr. Sinnett (the psychologist who had conducted a consultative psychological evaluation of Plaintiff on April 30, 1999) and stated that "pharmacological intervention alone is not sufficient to relieve the PTSD [post traumatic stress disorder] symptoms." (Tr. 473.) Ms. Heller states in her letter that it is "well-known that individuals with post traumatic stress disorder require a combination of pharmaco-

**24.** *Id.* (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)(2)).

**25.** *Id.* (citing 20 C.F.R. §§ 404.1527(d), 416.927(d)(2)).

**26.** *Frey v. Bowen,* 816 F.2d 508, 513 (10th Cir.1987).

**27.** The letter, which was undated, was received by Plaintiff's attorney on July 16, 1999. (Tr. 4, 473.)

logical intervention and psychotherapy to place symptoms in remission to the point that it is possible for them to function above daily maintenance." (Tr. 473.) She also indicates that Plaintiff has been unable to continue psychotherapy because she no longer has a medical card and she cannot afford to pay for therapy. (Tr. 473) She concludes her letter by stating: "I would highly recommend that Ms. Nichols be given the opportunity that others have been given to place symptoms of illness into remission by receiving disability and a medical card for a period of two years. In the long run, this will be more cost effective than allowing the symptoms to increase in intensity and result in the need for health care that could have been prevented." (Tr. 474.)

▮ The Court does not find that the ALJ erred in giving little or no weight to these opinions. As noted above, Ms. Heller is not an acceptable medical source and her opinions were not entitled to controlling weight. Furthermore, the ALJ did not err in discrediting Ms. Heller's opinions on the basis that during the six-month period Plaintiff had a medical card—a period during which the expense of obtaining psychotherapy was not an issue—she received psychotherapy on only eight occasions. The fact that Plaintiff received so few therapy sessions during that period cuts against Ms. Heller's opinion that Plaintiff's post traumatic stress disorder had not been resolved due to Plaintiff's inability to afford psychotherapy.

## B. The ALJ's Evaluation of the Testimony of Dr. George Chance

Plaintiff next argues that the ALJ erred by placing too great of weight on the testimony and opinion of George Chance, Ph. D., the psychologist and medical expert who testified at the administrative hearing. The ALJ adopted the finding of Dr. Chance in concluding that Plaintiff's mental impairments did not meet the criteria for Medical Listing 12.04 (affective disorder) or 12.06 (anxiety disorder). (Tr. 33.)

At the hearing, Dr. Chance questioned Plaintiff's diagnosis of post traumatic stress disorder, observing that the record contained no results of any formal testing that would support such a diagnosis and noting that she had never been prescribed any anti-anxiety medications. (Tr. 65–66, 68–69.) Dr. Chance also testified that the evidence did not support a diagnosis of major depression, as Plaintiff was taking only a low dose of anti-depressant medication, she did not exhibit strong symptoms of depression, and no formal testing supported such a diagnosis. (Tr. 65–68.) He also noted that Plaintiff had not required hospitalization or intense treatment for the depression. (Tr. 66–68.) Dr. Chance testified that Plaintiff's GAF[28] of 55–65,[29] along with the treatment notes from the Menninger Clinic, indicated that Plaintiff's symptoms were mild and that she did not suffer from ongoing severe symptoms for twelve continuous months. (Tr. 67.) Dr. Chance opined that Plaintiff's mental residual functional capacity

---

**28.** The Global Assessment of Functioning, or GAF, scale is used by clinicians to report an individual's overall level of functioning, including the individual's psychological, social, and occupational functioning. *See American Psychiatric Assoc., Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994).

**29.** A Discharge Summary from Menninger Clinic regarding Plaintiff's discharge from

psychotherapy on July 10, 1996 indicated that Plaintiff's current GAF was 65. (Tr. 376.) It also indicated that her highest GAF for the past year was 65. (Tr. 376.) In addition, the Discharge Summary indicated that when Plaintiff was first seen at the Menninger Clinic on October 9, 1995, her GAF was 55, with her highest GAF for the prior year being 65. (Tr. 375–76; *see also* October 19, 1995 Intake Note, Tr. 394.)

consisted of mild rather than moderate limitations. (Tr. 72–73.)

Plaintiff contends that the ALJ's reliance on Dr. Chance's opinions was erroneous for three reasons. First, Dr. Chance is not a medical doctor and cannot prescribe medications. According to Plaintiff, he is therefore not qualified to offer an opinion as to the severity of Plaintiff's depression based on the dosage of her medication or to offer an opinion as to the existence or non-existence of Plaintiff's post traumatic stress disorder based on the lack of medication. Second, Plaintiff argues that the ALJ should not have given weight to Dr. Chance's opinions because he is a paid witness, receiving compensation for his testimony from the Commissioner. Third, Plaintiff argues that Dr. Chance's opinion that Plaintiff did not suffer from severe symptoms over a continuous period of twelve months is inconsistent with the evidence of record.

■■■■■ Generally, the opinions of non-examining doctors are given less weight than those of examining doctors, but that does not mean opinions of medical advisors are entitled to no weight.[30] A medical advisor's opinion may be substantial evidence when it is supported by other evidence in the record or when it is consistent with the other evidence.[31] Moreover, the regulations expressly allow the ALJ to ask for and consider opinions from medical experts on the nature and severity of the claimant's impairments and whether the impairments equal the requirements of a Listed Impairment.[32] In considering such an opinion, the ALJ is to consider how that consultant's opinion comports with the rest of the evidence. Generally speaking, the more consistent the consultant's opinion is

with the record as a whole, the more weight the ALJ must give to that opinion.[33]

■■■■■ The Court's review of the record reveals that the ALJ properly weighed Dr. Chance's opinions and properly accepted them. His opinion was consistent with the GAF ratings Plaintiff had received while being treated at Menninger Clinic. (Tr. 375–76, 394.) It was also consistent with Nurse Practitioner Heller's medication progress notes, which indicated that Plaintiff's symptoms were generally in remission while on medication. (Tr. 371, 372, 373, 377, 389, 462, 463, 465.) Finally, as the ALJ noted in his decision (Tr. 33.), Dr. Chance's opinions were consistent with the findings of the State Agency Medical Consultant, George Hough, Ph.D., a psychologist who conducted a Mental Residual Functional Capacity Assessment of Plaintiff on November 18, 1997. (*See* Tr. 441–454.) Dr. Hough found Plaintiff's abilities for understanding and memory, sustained concentration and persistence, social interaction, and adaptation to be "not significantly limited." (Tr. 441–42.) The only exception was that Plaintiff's ability to maintain attention and concentration for extended periods was "moderately limited." (Tr. 441–42.) After completing his assessment, Dr. Hough concluded that Plaintiff "continues to retain sufficient RFC for simple unskilled work." (Tr. 443.)

While Dr. Chance's opinions conflict with those expressed by Faye Heller in the Medical Source Statement and letter of July 1999, as noted above, the ALJ was not required to give those opinions controlling weight as they were from a nurse

---

30. *Andrews v. Shalala,* 53 F.3d 1035, 1041 (9th Cir.1995); *see also Talbot v. Heckler,* 814 F.2d 1456, 1463 (10th Cir.1987) (reports of reviewing doctors given less weight than those of examining doctors).

31. *Andrews,* 53 F.3d at 1041.

32. 20 C.F.R. § 416.927(f)(1) (1999).

33. 20 C.F.R. § 416.927(d)(4) (1999).

practitioner. Those opinions were also inconsistent with Ms. Heller's own progress notes. In sum, the Court finds that the ALJ did not err in giving weight to Dr. Chance's conclusions that Plaintiff does not suffer from an impairment that meets the Listings and that substantial evidence supports those conclusions.

 In addition, the Court does not find that the ALJ committed reversible error by taking into consideration Dr. Chance's conclusions about the mild dosage of Plaintiff's anti-depressant medications and the lack of any anti-anxiety medications. Plaintiff presents the Court with no regulatory or case law authority that would require Dr. Chance to be licensed to prescribe medications before he could provide an opinion relating to the medications taken by Plaintiff. Psychologists are generally knowledgeable about the types and dosages of medications used to treat psychological conditions and typically monitor the progress of their patients on various medications. The Court finds no basis to prohibit a psychologist who is testifying as a medical expert from providing opinions about the dosage of medications prescribed. Also, it is well settled that the ALJ may, without the benefit of any expert opinion, take into account the fact that a claimant takes no medication in determining whether the claimant has established the existence of a disability.[34]

 The Court also rejects Plaintiff's argument that the ALJ should not have relied on Dr. Chance's testimony because he was compensated by the Commissioner for giving his testimony. Medical experts routinely testify at administrative hearings before the ALJ, and are compensated for their time.[35] Moreover, Plaintiff, through her attorney, was afforded the full opportunity to cross-examine Dr. Chance at the hearing. Dr. Chance based his opinions on the evidence of record. There is no basis for this Court to conclude that Dr. Chance was in any manner biased or inclined to prejudice Plaintiff's interests. The acceptance of testimony of medical and vocational experts, both of whom are compensated by the Commissioner, is a usual practice in this type of proceeding.[36] The mere fact that this witness was presented by the Commissioner and received compensation for his services is not enough for this Court to infer that Plaintiff was deprived of a fair and impartial hearing.[37]

## C. The Commissioner's Evaluation of Dr. Lynn Davidson–Stroh's Opinions

Plaintiff argues that the Commissioner erred in determining the weight to be given to the information provided by Lynn Davidson–Stroh, M.D., a doctor affiliated with the Menninger Clinic. Plaintiff's counsel submitted to the Appeals Council a

**34.** *See, e.g., Morris v. Callahan,* 989 F.Supp. 1364, 1368, 1370, 1372 (D.Kan.1997) (upholding ALJ's decision that plaintiff was not disabled where ALJ found that plaintiff took no medicine for his depression); *Workman v. Health & Human ·Servs.,* No. C–91–1261–MHP, 1993 WL 204607, at *5 (N.D.Cal. June 3, 1993) (finding plaintiff did not establish existence of mental disability where, *inter alia,* plaintiff took no psychiatric medication).

**35.** As noted above, the regulations expressly provide that the ALJ may ask for and consider opinions from medical experts on the nature

and severity of a claimant's impairments and whether the impairments equal the requirements of a Listed Impairment. 20 C.F.R. § 416.927(f)(1) (1999).

**36.** *Borrero Arce v. Finch,* 307 F.Supp. 1071, 1074–75 (D.P.R.1969).

**37.** *Id.* (rejecting plaintiff's argument that testimony of medical and vocational experts at administrative hearing was biased merely because they were "paid witnesses" called to testify on behalf of the Social Security Administration).

letter from Dr. Davidson–Stroh, which was dated June 15, 2000. (Tr. 475.) This was new evidence that was submitted to the Appeals Council, and it was not available to the ALJ at the time of either the April 2 or July 20, 1999 hearings or at the time he rendered his decision on August 17, 1999. Thus, the ALJ did not consider the letter in rendering his decision.

In the letter, Dr. Davidson–Stroh indicated that Plaintiff had been under her care since February 10, 2000 "for individual psychotherapy and medication management for chronic post-traumatic stress disorder." (Tr. 475.) Dr. Davidson–Stroh further indicated that Plaintiff exhibits depressive features and has been on anti-depressants. (Tr. 475.) Dr. Davidson–Stroh stated: "At this time, I do not feel she could mange [sic] the stress of even a part time job outside the home in addition to her duties of caring for her children. Due to severe financial constraints under which this family operates, I recommend that she be granted disability and a medical card for a period of at least two years." (Tr. 475.)

▮▮▮▮ The Appeals Council reviewed Dr. Davidson–Stroh's letter, but concluded that it did not provide a basis for changing the ALJ's decision. (Tr. 6.) The Appeals Council did not give specific reasons for this finding. The Court notes, however, that evidence presented to the Appeals Council is to be considered only to the extent that it is (1) new, (2) material, and (3) "relates to the period on or before the date of the administrative law judge hearing decision."[38] Here, the evidence does not relate to the period on or before the

ALJ's decision of August 17, 1999. Rather, the evidence relates to Plaintiff's condition during the period February 10 through June 15, 2000, when Dr. Davidson–Stroh treated her. There is nothing in Dr. Davidson–Stroh's letter indicative of Plaintiff's condition on or before August 17, 1999. Thus, the Appeals Council was not required to review this new evidence.

▮▮▮▮ The question thus becomes whether this Court is required to review it. Whether Dr. Davidson–Stroh's letter qualifies as new, material, and relating to the period on or before the ALJ's decision is a question of law subject to this court's *de novo* review.[39] The Court has concluded that this evidence does not relate to the relevant period. Thus, the record to be considered on review does not include this letter, and the Court will not consider it.

▮▮▮▮ Even if the Court were to hold otherwise and were to consider the letter part of the record, the Court would nevertheless conclude that it does not provide a basis for changing the ALJ's decision. The opinions contained in Dr. Davidson–Stroh's must be discounted as they are too brief and conclusory.[40] Moreover, they are wholly unsupported by any medical evidence, treatment notes, specific findings, or clinical or diagnostic techniques.[41]

### D. The ALJ's Credibility Determination

Plaintiff next argues that the ALJ erred in determining the weight to be given Plaintiff's testimony because the ALJ allegedly never made "a specific credibility determination"[42] and failed to consider

---

38. 20 C.F.R. § 416.1470(b) (2001); *see also O'Dell v. Shalala,* 44 F.3d 855, 859 (10th Cir.1994).

39. *Box v. Shalala,* 52 F.3d 168, 171 (8th Cir. 1995); *Keeton v. Dep't of Health & Human Servs.,* 21 F.3d 1064, 1066 (11th Cir.1994).

40. *Frey v. Bowen,* 816 F.2d 508, 513 (1987).

41. *See Castellano v. Sec'y of Health & Human Servs.,* 26 F.3d 1027, 1029 (10th Cir.1994); 20 C.F.R. § 416.927(d)(2) (1999).

42. Pltf. Br., doc. 13 at p. 22.

and discuss all of the *Luna* factors in determining Plaintiff's credibility. Plaintiff also contends that, to the extent the ALJ did make a credibility determination, it was flawed and not supported by substantial evidence.

Before proceeding to address each of these arguments, the Court notes that credibility determinations are "peculiarly the province of the finder of fact," and should not be upset if supported by substantial evidence.[43] Courts must defer to the ALJ as the trier of fact, as the ALJ is "the individual optimally positioned to observe and assess witness credibility."[44] At the same time, however, the ALJ must explain why specific evidence supports a conclusion that the claimant is not credible.[45] Credibility findings "should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings."[46]

### 1. Did the ALJ make a credibility determination?

Contrary to what Plaintiff asserts, the ALJ did in fact make a credibility determination. He expressly found that "the claimant's statements concerning his or her impairments and their impact on the ability to work are credible only to the extent they indicate an inability to engage in activity exceeding the residual functional capacity set forth below." (Tr. 36.)

### 2. Did the ALJ properly consider the Luna factors?

Under the Tenth Circuit's decision in *Luna v. Bowen*,[47] the ALJ must decide whether a claimant's subjective claims of pain and other symptoms are credible, considering such factors as the levels of medication and their effectiveness, the extensiveness of the attempts (medical or nonmedical) to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ, the motivation of and relationship between the claimant and other witnesses, and the consistency or compatibility of nonmedical testimony with objective medical evidence.[48] Similar factors are set forth in 20 C.F.R. § 416.929(c)(3) (1999), a regulation that the ALJ cited in his decision.[49] (*See* Tr. 34.)

The Court finds that the ALJ did consider the kinds of factors set forth in *Luna* and 20 C.F.R. § 416.929(c)(3) in evaluating the credibility of Plaintiff's allegations of disabling symptoms. He also recited the specific evidence he relied on in considering those factors. More specifically, the ALJ considered Plaintiff's daily ac-

---

**43.** *Kepler v. Chater*, 68 F.3d 387, 391 (10th Cir.1995) (quoting *Diaz v. Sec'y of Health & Human Servs.*, 898 F.2d 774, 777 (10th Cir. 1990)).

**44.** *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir.1991); *see also Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1499 (10th Cir.1992) ("Credibility is the province of the ALJ.").

**45.** *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir.2000); *Kepler*, 68 F.3d at 391.

**46.** *Kepler*, 68 F.3d at 391 (quotations omitted).

**47.** 834 F.2d 161 (10th Cir.1987).

**48.** *Kepler*, 68 F.3d at 391 (citations omitted); *Luna*, 834 F.2d at 165–66.

**49.** Pursuant to that regulation, the ALJ is to consider the following factors relevant to a claimant's symptoms, such as pain: (1) daily activities; (2) location, duration, frequency, and intensity of pain or other symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment received to relieve pain or other symptoms; and (6) measures taken to relieve pain or other symptoms. 20 C.F.R. § 416.929(c)(3) (1999).

tivities and noted that she cares for four children between the ages of eight and three, all of whom were born after the alleged disability onset date. (Tr. 34.) She also home schools one of the children. (Tr. 34.) The ALJ also cited Plaintiff's very low earnings prior to her alleged onset of disability in December 1989. (Tr. 34.) Her earnings record revealed that she had no earnings at all prior to 1988 and earnings of only $1,280 in 1988 and $4,553 in 1989. (Tr. 34.) He concluded that her prior low earnings and child rearing duties provided her with little motivation to work outside the home. (Tr. 34–35.)

The ALJ also considered the treatment that Plaintiff sought. He observed that although she claimed her disability began in December 1989, she did not pursue any type of psychological treatment until October 1995—more than six years later. (Tr. 35.) He did note that she claims she is unable to afford psychotherapy (Tr. 35); however, he found nothing in the record to indicate that she had pursued or applied for any type of indigent program for psychotherapy or counseling. (Tr. 35.) He observed that during the time period Plaintiff possessed a medical card and had access to psychotherapy, she attended only eight counseling sessions over a six-month period. (Tr. 35.) In addition, the ALJ recognized that the progress notes and Discharge Summary from Menninger Clinic indicated that Plaintiff's symptoms of depression were generally in remission on medication. (Tr. 31–32.)

The Court finds that the ALJ's discussion of these factors was sufficient. It is not necessary that the ALJ discuss each and every factor set forth in *Luna* and 20 C.F.R. § 416.929(c)(3) (1999). So long as

the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, the ALJ need not make a "formalistic factor-by-factor recitation of the evidence."[50] Here, the ALJ set forth the specific evidence he relied upon, he applied the correct legal standards in evaluating Plaintiff's subjective allegations of pain and other symptoms, and substantial evidence supported his findings. Plaintiff's arguments provide no basis for the Court to overturn the ALJ's credibility findings.

### 3. Did the ALJ improperly discount Plaintiff's credibility?

Finally, Plaintiff argues that the ALJ committed error by improperly discounting Plaintiff's credibility on several points. She argues that the ALJ had no basis to discount her credibility based on the fact that she attended only eight psychotherapy sessions during the six-month period that she possessed a medical card. Plaintiff asserts that attending psychotherapy more than once a month should be deemed sufficient, or, in the alternative, that the ALJ should have sought expert opinion on this issue.

 The Court does not agree. Both *Luna* and 20 C.F.R. § 416.929(c)(3) (1999) require the ALJ to consider treatment that the claimant has received to relieve the pain or other symptoms and the frequency of the claimant's medical contacts. There is no case law or regulation that requires the ALJ to obtain expert opinion about these factors. The Court finds that it is within the province of the ALJ to determine whether the frequency of a claimant's treatment sessions are sufficient to support the claim of disability. Furthermore, the Court concludes that the

---

**50.** *See Qualls,* 206 F.3d at 1372; *see also Bridgeford v. Chater,* 922 F.Supp. 449, 459 (D.Kan.1995) (citing *Porter v. Chater,* 895 F.Supp. 1427, 1436 (D.Kan.1995)) (while the

ALJ is required to consider all of the *Luna* factors, the failure to discuss all of them is not error in itself).

ALJ in this case did not err in concluding that eight sessions over a six-month period was inconsistent with Plaintiff's claim that she was totally disabled by her depression and post traumatic stress disorder.

Next, Plaintiff argues that the ALJ improperly concluded that Plaintiff's allegations of disabling symptoms were inconsistent with her belonging to a strict religious group. The ALJ stated:

> The claimant reports that she was raised in a strict religious family with militia ties and that this is the primary source of her marked distress. One of her physicians noted that the claimant is a member of a local orthodox Catholic group which "places a very high emotional drain on a lot of its members[.]" The undersigned find [sic] it inconsistent that the claimant would belong to such a strict religious group if she were distressed by childhood trauma brought about in part by her parents' strict religious beliefs.

(Tr. 35.)

■ The Court agrees with Plaintiff that the ALJ misinterpreted Plaintiff's testimony and that the ALJ's conclusion is unsupported by the evidence. The Court, however, does not find this sufficient reason to overturn the ALJ's credibility determination, in light of the other, valid reasons that the ALJ cites.

In sum, the Court finds that substantial evidence in the record supports the ALJ's credibility assessment and that he adequately set forth the reasons underlying his assessment. The Court will therefore not disturb the ALJ's credibility findings.

### E. The ALJ's Residual Functional Capacity Determination

Plaintiff argues that the ALJ erred at step four by failing to adequately support his Residual Functional Capacity ("RFC") determination. According to Plaintiff, the ALJ failed to link his RFC determination to specific evidence in the record and failed to comply with 20 C.F.R. § 416.945 and Social Security Ruling 96–8p.[51]

Step four, at which the ALJ found Plaintiff not disabled, is comprised · of three phases. In the first phase, the ALJ must evaluate a claimant's physical and mental RFC.[52] In this phase, the ALJ first identifies the individual's functional limitations or restrictions and assesses his/her work-related abilities on a function-by-function basis.[53] Then, the ALJ expresses the claimant's RFC "in terms of the exertional levels of work: sedentary, light, medium, heavy, and very heavy." [54] In the second phase, the ALJ must "determine the physical and mental demands of the claimant's past relevant work." [55] In the final phase, the ALJ determines "whether the claimant has the ability to meet the job demands found in phase two despite the mental and/or physical limitations found in phase one." [56]

■ A claimant bears the burden of proving that the claimant's impairments prevent the claimant from performing work that he/she has performed in the past.[57] When, however, the ALJ makes

---

51. Although Plaintiff treats these as two separate arguments, the Court will address them together, as the factual and legal issues raised are intertwined.

52. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir.1996) (citation omitted).

53. Soc. Sec. Rul. 96–8p, 1996 WL 374184, at *1.

54. *Id.*

55. *Winfrey*, 92 F.3d at 1023.

56. · *Id.*

57. *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir.1988) (citing *Bowen v. Yuckert*, 482 U.S. 137, 146, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)).

the ultimate finding that a claimant is not disabled at step four, the ALJ is required by Social Security Ruling 96–8p to make specific and detailed predicate findings concerning the claimant's RFC, the physical and mental demands of the claimant's past jobs, and how those demands mesh with the claimant's particular exertional and nonexertional limitations.[58]

Social Security Ruling 96–8p provides in pertinent part:

The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. A failure to first make a function-by-function assessment of the claimant's limitations of restrictions could result in the adjudicator overlooking some of the claimant's limitations or restrictions.[59]

In addition, under the applicable regulations, the ALJ, in assessing the total limiting effects of a claimant's impairments and related symptoms, is to "consider all of the medical and nonmedical evidence." [60] Finally, Tenth Circuit precedent requires the ALJ to affirmatively link his/her findings to substantial evidence in the record and prohibits the ALJ from rendering findings in a conclusory fashion.[61]

In this case, the ALJ made the following RFC determination:

The undersigned finds that the claimant has significant non-exertional limitations which interfere with her ability to work. The evidence supports a finding that she is moderately limited in the ability to understand and remember detailed instructions; perform activities within a schedule, maintain regular work attendance, and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others.

(Tr. 36.)

Plaintiff argues that the ALJ committed error because he failed to discuss any medical evidence *in support* of his RFC determination; the only evidence he did discuss was the evidence that he *rejected.* The Court agrees.

**58.** *Winters v. Barnhart,* No. 00–2419–DJW, 2002 WL 1286134, at *14 (D.Kan. June 5, 2002) (citing Soc. Sec. Rul. 96–8p, 1996 WL 374184; *Winfrey v. Chater,* 92 F.3d 1017, 1023–25 (10th Cir.1996)).

**59.** Soc. Sec. Rul. 96–8p, 1996 WL 374184, at *7.

**60.** 20 C.F.R. § 416.945 (1999).

**61.** See *Kepler v. Chater,* 68 F.3d 387, 391 (10th Cir.1995) (administrative agencies must give reasons for their decisions; "Findings as to credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings.") (citation omitted).

The ALJ spends considerable time discussing the Medical Source Statement and the July 1999 letter from Nurse Practitioner Heller, and he adequately sets forth his reasons for rejecting Ms. Heller's opinions regarding Plaintiff's limitations. (*See* Tr. 36–37.) The ALJ also discusses Plaintiff's own statements regarding her limitations and found her subjective complaints to not be entirely credible. He wrote in his decision:

> In reaching the conclusions about the claimant's residual functional capacity, the undersigned has considered the effects of the claimant's alleged impairments, pain and other symptoms in accordance with the criteria set forth in the regulations. The claimant has impairments that could reasonably be expected to produce some of the symptoms alleged, but the claimant's complaints suggest a greater severity of impairment than can be shown by the objective medical evidence alone.

(Tr. 34.) The ALJ went on to conclude that he found Plaintiff's statements regarding her impairments and their impact on her ability to work credible only to the extent that they indicated an inability to engage in activity exceeding the RFC set forth in his decision. (Tr. 36.)

The ALJ also considered the assessments of the state agency medical consultants. (Tr. 37, 441–45.) The ALJ's decision states:

> The undersigned also considered the findings of the state agency medical consultants regarding the claimant's ability to engage in work-related activity. Although they did not examine the claimant, they provided specific reasons for their opinions about the claimant's physical residual functional capacity showing that they were grounded in the evidence in the case record, including careful consideration of the claimant's credible allegations about her symptoms and limita-

tions. *Based upon the other objective medical evidence of record, the undersigned finds that the claimant's psychological impairments are more severe and limiting than originally thought* (20 CFR 416.927(d) and (f); Social Security Rulings 96–2p, 96–6p, 96–8p).

(Tr. 37–38) (emphasis added).

The above paragraph, while rather awkwardly worded, indicates that the ALJ disagreed with the state agency medical consultants' RFC assessment. He found Plaintiff's impairments to be more severe and more limited than indicated in the state agency medical consultants' assessment. As noted above, the state agency medical consultants found Plaintiff "not significantly limited" in all categories, except for one—Plaintiff was "moderately limited" only in the ability to maintain attention and concentration for extended periods. (Tr. 441.) The ALJ, however, found Plaintiff "moderately limited" in all categories. (Tr. 36.)

The only "evidence" cited by the ALJ in support of his RFC determination, i.e., that Plaintiff is moderately limited in all categories, is "the other objective medical evidence of record." (Tr. 37–38.) The ALJ never identifies this "other objective medical evidence," and he cites to no medical expert testimony, medical records, or other evidence in support of his RFC determination. The Court is simply left to speculate as to what evidence the ALJ is relying upon. In addition, the ALJ fails to explain his reasons for his apparent rejection of the finding of the state agency medical consultants' RFC assessment.

■ Due to these failures of the ALJ, the Court cannot adequately assess whether relevant evidence supports the ALJ's RFC determination. His bare conclusions are simply beyond meaningful judicial review. As a result, the Court holds that the case must be remanded. Upon remand,

the Commissioner shall provide the proper narrative discussion describing how the evidence supports his conclusions at step four, as required by Social Security Ruling 96–8p. This shall include a discussion of the reasons supporting the ALJ's apparent rejection of the state agency medical consultants' RFC assessment and the identification and discussion of the specific evidence that the ALJ relied upon in making his RFC determination.

### F. Hypothetical Question to the Vocational Expert

 Finally, Plaintiff argues that the ALJ erred by failing to include all of Plaintiff's limitations, including those that were addressed in the Medical Source Statement, in the hypothetical question posed to the vocational expert. Plaintiff asserts this argument for the very first time in her reply brief. This Court, however, does not ordinarily review issues raised for the first time in a reply brief.[62] The Court will therefore not address this argument.

### V. Conclusion

Based upon the reasons set forth above, the Court reverses the decision of the Commissioner denying Plaintiff benefits and remands this action to the Commissioner to conduct further proceedings. On remand, the Commissioner shall provide the proper narrative discussion describing how the evidence supports his conclusions at step four, as required by Social Security Ruling 96–8p. This shall include a discussion of the reasons supporting the ALJ's apparent rejection of the state agency medical consultants' RFC in addition to a discussion of the specific evidence that the ALJ relied upon in making his RFC determination.

**IT IS THEREFORE ORDERED** that the decision of the Commissioner denying Plaintiff benefits is reversed and the case is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. This decision disposes of this case, including Plaintiff's Complaint (doc 1), which has been considered a petition for review.

---

**62.** *See Stump v. Gates,* 211 F.3d 527, 533 (10th Cir.2000) (court will not ordinarily review issues raised for the first time in reply brief); *Sadeghi v. INS,* 40 F.3d 1139, 1143 (10th Cir.1994) (court generally does not consider issues raised for first time in reply brief, except where those issues relate to jurisdictional requirements).